**In re Application of NATIONAL BROAD-CASTING COMPANY, INC. et al., Applicants–Appellees.**

**UNITED STATES of America**

v.

**Michael O. MYERS et al., Defendants–Appellants.**

**No. 1667, Docket 80–1345.**

United States Court of Appeals, Second Circuit.

Argued Aug. 21, 1980.

Submitted Sept. 15, 1980.

Decided Oct. 1, 1980.

---

See also, 2 Cir., 635 F.2d 942.

Neil I. Levy and Richard Ben–Veniste, Washington, D.C., for defendant–appellant Criden.

Henry F. Furst, Newark, N.J. (Raymond A. Brown, Newark, N.J., on brief), for defendant–appellant Errichetti.

John J. Duffy, Philadelphia, Pa., for defendant–appellant Johanson.

(Plato Cacheres and Larry Gondelman, Washington, D.C., on brief for defendant–appellant Myers.)

Edward R. Korman, U.S. Atty., Brooklyn, N.Y., for the United States.

Floyd Abrams, New York City (Robert C. Meade, Cahill, Gordon & Reindel, J. Marshall Wellborn, National Broadcasting Companies, Inc., Samuel Antar, American Broadcasting Companies, and Allen Shaklan, CBS Inc., New York City, on brief), for applicants–appellees National Broadcasting Co., American Broadcasting Companies, and CBS Inc.

Daniel Rezneck, Washington, D.C. (Stephen E. Kaufman, New York City, Clifford Stromberg, Robert N. Weiner, Arnold & Porter, Washington, D.C., on brief), for Congressman Frank Thompson, Jr., as amicus curiae.

Before NEWMAN and KEARSE, Circuit Judges, and DUMBAULD,* District Judge.

NEWMAN, Circuit Judge:

This appeal presents an infrequently litigated issue within the general context of the fair trial–free press controversy: whether television networks may copy and televise videotapes entered into evidence in a criminal trial. The issue arose during the first of the so–called Abscam cases, see *United States v. Myers*, 635 F.2d 932 (2d Cir. 1980), criminal prosecutions of Members of Congress and other public officials on bribery and related charges arising out of an elaborate F.B.I. undercover "sting" operation. The District Court for the Eastern District of New York (George C. Pratt, Judge) granted the application of the three major television networks to copy and televise all videotapes admitted into evidence. We affirm the District Court's order.

## I.

### Background

The history of the Abscam cases begins in 1978. Sometime during that year, law enforcement officials in the Eastern District of New York conceived of an undercover operation to determine whether public officials would commit bribery offenses if presented with the opportunity to do so. Agents of the Federal Bureau of Investigation and a salaried informant developed a "sting" operation, using a fictitious Middle Eastern business, Abdul Enterprises Ltd., as a cover. The undercover operatives posed as representatives of the, owners of the Middle Eastern business who, in turn, were portrayed to potential targets of the

operation as wealthy individuals seeking to emigrate to, and invest money in, the United States. Substantial sums of cash were offered as bribes ostensibly to secure the help of the public officials on various governmental matters including solving the immigration problems of the "businessmen" by sponsoring private bills in Congress and by influencing actions of the Executive Branch. Acceptance of these bribes formed the basis of the criminal charges. The conversations of the undercover men and their targets were surreptitiously recorded on audio and video tapes. The tapes at issue in this case record some of the dealings between the undercover operatives and the four appellants, notably the acceptance by Congressman Myers of $50,000 cash and his demand of an additional $35,000.

On February 2, 1980, several news organizations disclosed the existence of the undercover operation. Broadcast and print journalists reported that several Members of Congress, state and local officials, lawyers, and businessmen had been videotaped in the act of negotiating and, in some instances, accepting bribes offered by the operators of the "sting." These revelations triggered an explosion of publicity in the national and local media. As a result, the word "Abscam" (a coined word from the first two letters of Abdul Enterprises, Ltd. and the word "scam"), quickly became a widely known label for a series of episodes of alleged political corruption. The news media also reported that they had learned about Abscam from law enforcement officials. Though the identity of the sources remains unclear, their employment within the Department of Justice has been acknowledged by the Attorney General, who called the leaks one of the "low points" in the history of the Department. Address of the Attorney General of the United States Before Department of Justice Employees, March 5, 1980, p. 8.

Thus far, the Abscam operation has led to seven indictments, alleging bribery and re-

---

* Honorable Edward Dumbauld of the United States District Court for the Western District of Pennsylvania, sitting by designation.

lated offenses. The first, returned in the Eastern District of New York, charges the four appellants in this case, Congressman Michael O. Myers of the First Congressional District of Pennsylvania; Angelo J. Errichetti, the Mayor of Camden, New Jersey, who is also a New Jersey State senator; Louis C. Johanson, a member of the Philadelphia City Council; and Howard L. Criden, a Philadelphia lawyer. The charges against the appellants are detailed in *United States v. Myers, supra.* Three other indictments are pending in the Eastern District of New York. One charges Congressman Raymond Lederer of the Third District of Pennsylvania and appellants Criden, Errichetti, and Johanson. The second charges Congressman Frank Thompson, Jr. of the Fourth District of New Jersey, Congressman John M. Murphy of the Seventeenth District of New York, Criden, and Joseph Sylvestri, a New Jersey businessman. The third charges Alexander Alexandro, an official of the Immigration and Naturalization Service, and Al Carpentier. One indictment in the Eastern District of Pennsylvania charges Criden, Johanson, and two Philadelphia City Councilmen, George Schwartz and Harry Jannotti. Two indictments have been returned in the District of Columbia. One charges Congressman John Jenrette of the Sixth District of South Carolina and John Stowe. The other charges Congressman Richard Kelly of the Fifth District of Florida, Eugene Ciuzio, William Rosenberg, and Stanley Weisz.

Trial in this case began August 11. When the jury was selected, contrary to the expectations of the appellants as to the extent of the pre–trial publicity concerning Abscam, only about one–half of the prospective jurors indicated that they had ever heard of Abscam. Moreover, as Judge Pratt noted in ruling on the networks' request for copies of the videotapes, of those members of the venire who had any knowledge of Abscam, only eight or ten had "anything more than a most generalized kind of recollection what it was all about." Trial Tr. 1478. At the defendants' request, the jury was not sequestered.

The appellants did not dispute the authenticity of the tapes, nor challenge the occurrence of the events portrayed. Their essential defense at trial was that they never had any intention of taking any official action on behalf of the "businessmen," and, in effect, were defrauding the "businessmen" by seeking and obtaining cash from them.

The courtroom was equipped to permit presentation of the audio and video tapes to the jury. Under the arrangements established in the courtroom, the tapes also could be seen and heard by journalists and members of the general public seated in the spectator section. In the interest of accuracy, verbatim transcripts of the contents of the tapes were distributed to the jury and members of the press. Media sketch artists were permitted to sketch the scenes recorded on the videotapes as they were presented to the jury. Excerpts from the transcripts and the artists' sketches were published by the print and electronic media throughout the trial.

On the first and third days of the trial, broadcast journalists made informal requests of the trial judge for permission to copy the tapes admitted into evidence. Judge Pratt denied these requests but invited the networks to submit a formal application. In their formal application filed on August 14, the networks proposed to copy the tapes simultaneously with the presentation of the tapes to the jury. The copying was to be accomplished, without disturbing the trial, by means of a single, inconspicuous wire attached to the videotape projector in the courtroom and connected to the networks' equipment located in an adjacent room of the courthouse. The networks intended to broadcast all or portions of the tapes to the public.

On the morning of August 15, the District Court heard argument on the networks' application. In an oral opinion rendered from the bench during the afternoon session, the Court granted the application subject to the qualification that the tapes be copied at the close of the trial day or half–day in which each tape was admitted

into evidence. In so ruling, the Court stated that "the tapes themselves are evidence [and] they are, under common law principles, available to the public and the press," unless "there is a strong showing of reasons why they should not be made available." Trial Tr. at 1480.

Judge Pratt stayed his order briefly to permit appellants to seek relief in this Court. The appellants promptly asked this Court to extend the stay pending appeal. We converted oral argument on that motion into an argument on the merits of the appeal, which we heard on August 21. On August 22, we set an expedited briefing schedule and continued the stay pending disposition of the appeal. *United States v. Myers, supra,* 635 F.2d 942 (2d Cir. 1980).

■ On August 30, the jury returned guilty verdicts against all four appellants. That circumstance has not diminished the networks' interest in copying and telecasting the tapes, nor the appellants' interest in preventing that result.[1] With this background in mind, we turn to the merits of the appeal.[2]

## II.

### The Merits

The issue on the merits is whether the District Court properly determined that the common law right of the public to inspect and copy judicial records permits copying and televising the tapes in evidence notwithstanding the concerns of the appellants and the *amicus* that their right to a fair trial in the *Myers* case and subsequent Abscam trials will be impaired. The existence of the common law right to inspect and copy judicial records is beyond dispute. See *Browne v. Cumming,* 10 B. & C. 70, 109 Eng.Rep. 377 (K.B. 1829); *Sloan Filter Co. v. El Paso Reduction Co.,* 117 F. 504 (C.C.D. Colo. 1902); *In re Sackett,* 30 C.C.P.A. 1214 (Pat.), 136 F.2d 248 (1943); and cases collected in 20 Am.Jur.2d Courts § 61 (1965); 66 Am.Jur.2d Records and Recording Laws § 12 (1973); 76 C.J.S. Records § 36 (1952); Annotation, Restricting Access to Judicial

1. None of the parties has suggested that the ending of the trial has mooted this appeal. In our August 22 ruling, we anticipated that the schedule we had set would most likely delay a decision of the appeal until after the trial, thereby denying the networks part of the relief they sought—the opportunity to televise the tapes during the trial. 635 F.2d at 944. While the tapes obviously cannot now be telecast during the *Myers* trial, we believe that all issues presented by the appeal should be decided, including the correctness of Judge Pratt's order permitting televising the tapes during the trial. In light of the impending Abscam trials in the Eastern District of New York and elsewhere, that issue is not merely "capable of repetition," it is virtually certain to recur, and it is likely to do so, as it did in this case, under circumstances "evading review." *See Richmond Newspapers, Inc. v. Virginia,* —— U.S. ——, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (July 2, 1980) (quoting *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)); *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 546–47, 96 S.Ct. 2791, 2796–97, 49 L.Ed.2d 683 (1976).

2. None of the parties has questioned whether Judge Pratt's order is appealable. Their understandable interest in a ruling does not however, permit us to ignore consideration of our jurisdiction. Technically, Judge Pratt's order, having been entered during the course of litigation

that has not yet reached a final judgment, might by considered appealable only if it satisfies the test of the collateral order doctrine. *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Since the order involves alleged rights of the networks as third parties to the criminal litigation and since the deferral of a ruling on their claim until appeal from the judgments of conviction would further deny them the relief they seek—namely, contemporaneous televising of the tapes, *Cohen* very likely applies. But we think there is an even more basic reason why Judge Pratt's order is appealable now. That order adjudicates what is essentially a dispute between the networks as applicants and the clerk of the District Court as custodian of the evidence the networks seek to copy. That dispute could have been treated by the District Court as a new civil case and given a number separate from the criminal litigation, as in fact occurred under similar circumstances when the networks sought to copy the Watergate tapes. *See United States v. Mitchell,* 386 F.Supp. 639, 640 (D.D.C. 1974) (matter treated as a "miscellaneous proceeding"). No jurisdictional significance should attach to the fact that Judge Pratt's order was entered within the framework of the pending criminal case, instead of a separate civil case.

Records, 175 A.L.R. 1260 (1948). The Supreme Court explicitly recognized this right in the Watergate tapes litigation, though the Court's decision ultimately rejected public copying because Congress had modified the common law right with legislation specifically restricting public access to the Watergate tapes. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1979). The Court noted that at common law some circumstances justify keeping court documents from public view, for example, to avoid using court records to " 'gratify private spite or promote public scandal,' " (quoting *In re Caswell*, 18 R.I. 835, 29 A. 259 (1893)) or "harm a litigant's competitive standing" or serve "improper purposes." *Warner Communications, supra*, 435 U.S. at 598, 98 S.Ct. at 1312. These circumstances, it should be noted, warranted preventing all public scrutiny; they did not prevent copying and enhanced dissemination of items already publicly disclosed by admission into evidence at a public session of court. In the absence of statute, the Court recognized a "presumption–however gauged–in favor of public access to judicial records," *id.* at 602, 98 S.Ct. at 1314, with the disclosure in a particular case normally left to the "informed discretion" of the courts, *id.* at 603, 98 S.Ct. at 1304, after "weighing the interests advanced by the parties in light of the public interest and the duty of the courts." *Id.* at 602,[3] 98 S.Ct. at 1314 (footnote omitted).

■ The common law right to inspect and copy public records originally permitted copying the content of written documents. With the advent of modern means of document reproduction, such as photography and xerography, the right was applied to copying the physical embodiment of the document. See *People v. Peller*, 34 Ill. App.2d 372, 181 N.E.2d 376, 378 (1962); *Moore v. Bd. of Freeholders of Mercer County*, 76 N.J.Super. 396, 184 A.2d 748, 754 (1962). In *Warner Communications* the Court assumed, without deciding, that the common law right also applied to tape recordings, as well as documents. 435 U.S. at 599 n.11, 98 S.Ct. at 1312 n.11. We agree with the District of Columbia Circuit and other courts that have faced the issue that the nondocumentary nature of the evidence sought to be copied does not remove the common law right. *United States v. Mitchell*, 551 F.2d 1252, 1258 n.21 (D.C.Cir.1976) (audio tapes), *rev'd on other grounds sub nom. Nixon v. Warner Communications*, 435 U.S. 589, 98 S.Ct. 1306, (1978); *Menge v. City of Manchester*, 113 N.H. 533, 311 A.2d 116 (1973) (magnetic computer tapes); *Ortiz v. Jaramillo*, 82 N.M. 445, 483 P.2d 500 (1971) (same); contra, *Guarriello v. Benson*, 90 N.J.Super. 233, 217 A.2d 22 (1966) (audio tapes).

The most pertinent precedent considering the common law right in the context of evidence sought for public broadcasting is the decision of the Court of Appeals for the District of Columbia Circuit in the Watergate tapes litigation, a decision based on common law standards without regard to the statute deemed controlling by the Supreme Court. *United States v. Mitchell, supra*. The Court of Appeals stressed that the common law right to inspect and copy judicial records is fundamental in a democracy. *Id.* at 1258. The District Court had denied release of the tapes because of the risk of impact upon the fair trial rights of the defendants who might face a retrial in the event their convictions, then on appeal, were reversed. The Court of Appeals considered the possibility of prejudice at a "*hypothetical* second trial" too speculative to justify impairment of the public's right of access. *Id.* at 1261 (emphasis in the original). In the view of the D. C. Circuit, the District Court had assigned the burden of proof to the wrong party by requiring the

---

**3.** *Warner Communications* does not clarify whether, in the absence of statute, the decision to release the tapes would have been left to the trial court, reviewable only for traditional abuse of discretion, or whether reviewing courts would themselves assess the competing interests. While the opinion refers to the need for the trial court to exercise an informed discretion, the Court also says that, in the absence of a statute "we" would be faced with the task of weighing the competing interests. 435 U.S. at 602, 98 S.Ct. at 1314.

networks to show some "compelling reason," *id.* at 1261, for access to the tapes. The Court of Appeals' decision, despite its reversal on statutory grounds, remains strong authority for the networks' common law right to copy and telecast tapes in evidence, at least those tapes portraying activities of defendants not facing a likelihood of subsequent trials.

We have found only one decision considering a request to inspect and copy evidence portraying individuals facing criminal trials, *Hearst Corp. v. Vogt*, 62 App.Div.2d 840, 406 N.Y.S.2d 567 (3d Dept. 1978). *Vogt* involved a newspaper's application to inspect and copy for publication thirty-one photographs admitted into evidence in the trial of a defendant charged with maintaining a house of prostitution. The prosecution arose as a result of a state investigation into prostitution and police corruption in the City of Albany. The photographs showed 19 individuals entering or leaving the defendant's premises on various occasions.

The state trial judge had denied the newspaper's application in all respects. The Appellate Division reversed the denial of the request to inspect but upheld the trial court's denial of copying. Noting that publication of the photographs "might" prevent a fair trial of the defendants awaiting trial and that the events shown in the photos had been reported to the public as a result of the first trial, the Appellate Division concluded that the trial court had properly exercised its discretion to deny copying "at this time." *Id.* at 843, 406 N.Y.S.2d at 569.

Justice Kane, dissenting from the denial of copying, stated that the "right of access, which makes the democratic spirit of an open judicial proceeding viable, can be circumscribed only after careful scrutiny and weighing of the counterbalancing interests offered in opposition to it." *Id.* at 843, 406 N.Y.S.2d at 570. In his view, denial of the newspaper's common law right to copy the exhibits was unjustified because the defendants had shown no more than a "mere risk of possible prejudice in future trials." *Ibid.*

Apart from whatever guidance we may discern from the Watergate tapes litigation and from the opinions in *Vogt*, there are two lines of authority that shape the context in which the issue before us arises, though they do not precisely aid its disposition. On the one hand are numerous expressions of the high responsibility of courts to assure the accused "a fair and reliable determination of guilt," *Estes v. Texas*, 381 U.S. 532, 564, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1956) (Warren, C. J., concurring), induced only by "evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). A trial court may not cooperate with the media in a manner that would create a significant risk of impairing the accused's right to a fair trial, see *Sheppard v. Maxwell*, 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966), and may stem "the flow of prejudicial publicity at its source, before it is obtained by representatives of the press." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 601, 96 S.Ct. 2791, 2823, 49 L.Ed.2d 683 (1978) (Brennan, J., with Stewart and Marshall, JJ., concurring in the judgment). On the other hand, the Supreme Court has also emphasized the high public interest in full opportunity to know whatever happens in a courtroom, except in those limited situations justifying nondisclosure of particular evidence. "What transpires in the court room is public property," *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947); accord, *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492–93, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975). Just this year, in rejecting the closing of a courtroom, the Supreme Court observed that "it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc. v. Virginia*, ---- U.S. ----, 100 S.Ct. 2814, 2823, 65 L.Ed.2d 973 (1980).

■ Having considered these lines of authority and the important values they reenforce, we find ourselves in agreement with the District of Columbia Circuit when it observed in *United States v. Mitchell, supra,* that there is a presumption in favor of public inspection and copying of any item entered into evidence at a public session of a trial.[4] Once the evidence has become known to the members of the public, including representatives of the press, through their attendance at a public session of court, it would take the most extraordinary circumstances to justify restrictions on the opportunity of those not physically in attendance at the courtroom to see and hear the evidence, when it is in a form that readily permits sight and sound reproduction.[5] The presumption is especially strong in a case like this where the evidence shows the actions of public officials, both the defendants and law enforcement personnel. Though the transcripts of the videotapes have already provided the public with an opportunity to know what words were spoken, there remains a legitimate and important interest in affording members of the public their own opportunity to see and hear evidence that records the activities of a Member of Congress and local elected officials, as well as agents of the Federal Bureau of Investigation. And there is a significant public interest in affording that opportunity contemporaneously with the introduction of the tapes into evidence in the courtroom, when public attention is alerted to the ongoing trial. *Cf. Richmond News-*

*papers, Inc. v. Virginia, supra* (closed courtroom not justified despite prompt release of "tapes" of the trial after its conclusion, —— U.S. —— at ——, 100 S.Ct. 2814, at 2820 n.3); *Nebraska Press Assn. v. Stuart, supra,* 427 U.S. at 560–61, 96 S.Ct. at 2803. When physical evidence is in a form that permits inspection and copying without any significant risk of impairing the integrity of the evidence or interfering with the orderly conduct of the trial,[6] only the most compelling circumstances should prevent contemporaneous public access to it.[7]

■ We do not think this strong presumption is rendered inapplicable to this case because the videotapes, while admitted into evidence as full exhibits, remain subject to challenge by the appellants on the ground that the methods by which the evidence was obtained violated their rights to due process of law. When Judge Pratt granted the networks' request for copying of the tapes, he still had pending the appellants' due process challenge to the evidence and to the indictment. Nevertheless the tapes were in evidence as full exhibits, their sights and sounds had been seen and heard by those in the courtroom, and the common law privilege of public inspection and copying had fully attached to them. We have no occasion to consider the different issues that would arise if evidence of questionable admissibility were only marked for identification.

Appellants contend that special circumstances outweighing the normal right of

---

4. If, for justifiable reasons, a particular item were entered into evidence under seal, the presumption would obviously not apply, because, with respect to that item of evidence, the session of court was not public.

5. Since we are here concerned only with copying of physical evidence, our decision has no bearing on the continuing issue, now undergoing reexamination in many of the state courts, as to whether the live testimony of witnesses should be broadcast or telecast. With physical evidence, there is no concern that awareness of dissemination of sight and sound beyond the courtroom might have some distorting impact upon the content of the evidence or the manner in which it is presented to the jury.

6. All parties acknowledge that the networks' proposal to copy the tapes posed no risk either to the integrity of the tapes or to the decorum of the courtroom. If the proposed method of accomplishing the physical copying requires some modification now that the trial has ended, the District Court retains broad discretion to approve and supervise any needed modification of copying technique.

7. The opportunity for copying need not necessarily occur simultaneously with the presentation of evidence to the jury. Judge Pratt's procedure for an opportunity to copy the tapes at the end of court sessions was an appropriate accommodation of the right of public access to judicial records with the orderly conduct of the trial.

public copying and inspection of evidence arise in this case because at the time of Judge Pratt's order, the *Myers* trial was still in progress, and, more importantly, because juries are soon to be selected to try other Abscam indictments pending against three of the appellants and against defendants not charged in the *Myers* case. The fact that the *Myers* trial had not concluded was properly considered by Judge Pratt to be no reason for denying the networks' request. The jury had already seen and heard the tapes, and Judge Pratt was entitled to rely on the jury's observance of his admonition to avoid exposure to reports of the trial in the news media. Moreover, the possibility that the jurors, despite that admonition, might see the tapes of excerpts unflattering to the appellants again on television did not pose a significant risk to a fair trial.[8]

Arguably of greater concern is the risk to a fair trial of the three *Myers* defendants and others facing trial on other Abscam indictments. Their claim, urged by appellants Criden, Errichetti, and Johanson, and by Congressman Thompson as *amicus*, is that the enhanced exposure and impact of the tapes that will occur through televising the copies will prejudice potential jurors against them and prevent them from receiving fair trials. We do not doubt the premise of this claim that televising the tapes will greatly increase the number of people with knowledge of their content beyond those already aware of the videotaped events through reading press accounts and viewing television newscasts. Nor do we doubt that seeing the tapes on television will create a stronger impression of the events among those who already have been exposed to news accounts of their contents.

We disagree, however, that the likelihood of such enhanced awareness of the tapes poses the kind of risk to fair trials for

Abscam defendants that justifies curtailing the public's right of access to courtroom evidence. Defendants, as well as the news media, frequently overestimate the extent of the public's awareness of news. In this very case, despite the extensive publicity about Abscam that unfortunately accompanied the initial revelations and that was legitimately renewed when the indictments were returned, about half of those summoned for jury selection had no knowledge of Abscam, and only a handful had more than cursory knowledge. Even the intensive publicity surrounding the events of Watergate, very likely the most widely reported crime of the past decade, did not prevent the selection of jurors without such knowledge of the events as would prevent them from serving impartially. *United States v. Haldeman*, 559 F.2d 31, 61–63 & n.37 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). See also *United States v. Kahaner*, 204 F.Supp. 921 (S.D.N.Y.1962), *aff'd*, 317 F.2d 459 (2d Cir.), *cert. denied*, 375 U.S. 836, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963).

The opportunity for voir dire examination still remains a sufficient device to eliminate from jury service those so affected by exposure to pre–trial publicity that they cannot fairly decide issues of guilt or innocence. See *Nebraska Press Assn. v. Stuart, supra*, 427 U.S. at 563–65, 96 S.Ct. at 2804–05. In relying on voir dire, we do not suggest that the televising of the tapes from the *Myers* case will not be seen by some persons who might be called for jury service in subsequent Abscam cases. We are satisfied, however, that voir dire inquiry can identify them and elicit a basis for excusing from the venire those viewers whose impartiality has been impaired.[9] We do not believe the public at large must be sanitized as if they all would become jurors in the remaining

---

**8.** We therefore reject the Government's suggestion that if the tapes had been made available for copying during the trial, Judge Pratt should have been directed to sequester the jury.

**9.** If voir dire examination should reveal that at a particular time and location there is genuine difficulty assembling an impartial jury, or even

that the effort to do so risks unduly narrowing the cross–section from which the trial jury will be selected, trial courts can take additional protective measures through the granting of a continuance or change of venue. See *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966).

954

Abscam trials. The alleged risk to a fair trial for the Abscam defendants yet to be tried is too speculative to justify denial of the public's right to inspect and copy evidence presented in open court.

We therefore affirm the order of the District Court. Since the passage of time erodes to some extent the vindication of the public access right the networks have asserted, we direct that the mandate issue forthwith.