UNITED STATES of America, Plaintiff,

v.

Barbara MOUZIN, et al., Defendants.

National Broadcasting Company, Inc., a Delaware corporation, Applicant.

No. CR 82–518(B)–AWT.

United States District Court,
C.D. California.

March 16, 1983.

Stephen S. Trott, U.S. Atty., Alexander H. Williams, III, Chief Asst. U.S. Atty., Robert L. Brosio, Asst. U.S. Atty., Chief, Crim. Div., Robert J. Perry, Asst. U.S. Atty., Los Angeles, Cal., for the U.S.

Howard Weitzman, Jean Costanza, Weitzman & Re, Los Angeles, Cal., for Barbara Mouzin.

Edward M. Medvene, Patricia H. Benson, Mitchell, Silberberg & Knupp, Los Angeles, Cal., for Anthony Cantelli and Mr. C.

Raymond Takiff, Coral Gables, Fla., for Samuel Schuster.

Victor Palacios, Glendale, Cal., for Alphonso Carvajal.

Alvin S. Michaelson, Michaelson & Withey, Los Angeles, Cal., for Oscar Castano.

Donald L. Zachary, Tracy S. Rich, Robert G. Mendez, Burbank, Cal., for applicant National Broadcasting Co., Inc.

## MEMORANDUM OPINION AND ORDER

TASHIMA, District Judge.

This is an application by National Broadcasting Company, Inc. ("NBC") to copy all video and audio tapes admitted into evidence during the trial of this criminal action.

The action involves a twelve-defendant, 28-count indictment. The indictment charges numerous substantive violations and three interlocking conspiracies to sell cocaine and to launder the cash proceeds of illegal cocaine sales through domestic and foreign financial institutions. Trial had just commenced against six of the defendants (including the corporate defendant) when this application was made. The trial

of one defendant was severed because of the unavailability of his retained counsel. Trial of the severed defendant is to commence upon the completion of the current trial, which is estimated to last eight weeks.

The prosecution has disclosed that it will seek to introduce numerous video and audio tapes during the trial. The Court has reviewed the transcripts of substantially all of the audio tapes that the prosecution seeks to introduce. Most of the audio tapes were recorded during court-approved wiretaps of some of ·the defendants' telephone lines. A few are tape recordings of meetings attended by defendants and undercover government agents involved in the investigation that led to this indictment. The Court understands that the video tapes will depict some of the defendants at an office staffed by undercover agents, at which the government contends certain illegal currency transactions were conducted.

Written opposition to NBC's application has been filed by one of the defendants and several of the remaining defendants have orally opposed the application. The government does not oppose the application.

The issue raised by NBC's application appears to be one of first impression in this circuit, although it has been the subject of several decisions by courts in other circuits, as well as law review commentary.[1] Paying heed to a recent Supreme Court decision, all of the decisions on this issue recognize that an application to copy evidence is not supported by any Constitutional right. Rather, ruling on NBC's application requires only an assessment of the strength of the common law right of access to judicial records in the face of possible harms arising from copying of the tapes by NBC. I conclude, for the reasons set forth below, that in this instance the possible harm that could arise from dissemination of the taped evi-

dence is too speculative and insubstantial to overcome the common law right of access to judicial records. Accordingly, NBC's application to copy the audio and video tapes admitted into evidence will be granted.

## I. LEGAL PRINCIPLES APPLICABLE TO THIS APPLICATION

The starting point in the analysis of this application is the Supreme Court's decision in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (deciding application to copy tapes of conversations made in offices in the White House and the Executive Office Building that had been introduced at the trial of the Watergate conspirators). *Warner Communications* holds that an application to copy taped evidence finds support in neither the First Amendment guarantee of freedom of the press nor the Sixth Amendment guarantee of a public trial. *Id.* at 608, 98 S.Ct. at 1317. The Court stated, however, that applications to copy tapes must be evaluated in light of the common law right of access to inspect and copy judicial records and documents. *Warner Communications* does not define fully the contours of the common law right of access, because the Court there found that Congress had displaced the common law right of access as to presidential tapes by the Presidential Recordings Act. *Id.* at 603, 98 S.Ct. at 1315. *Warner Communications* makes clear, however, that deciding an application resting on the common law right of access involves "the task of weighing the interests advanced by the parties in light of the public interest and the duty of the courts." *Id.* at 602, 98 S.Ct. at 1314.

Courts of appeals in five circuits and several district courts have issued opinions that discussed how this balancing task should be approached. The outcome in all of these

---

1. Cases include *United States v. Edwards ex rel. Application of Video-Indiana, Inc.,* 672 F.2d 1289 (7th Cir.1982); *Belo Broadcasting Corp. v. Clark,* 654 F.2d 423 (5th Cir.1981); *In re National Broadcasting Co.,* 653 F.2d 609 (D.C.Cir. 1981); *United States v. Criden ex rel. Application of National Broadcasting Corp.,* 648 F.2d 814 (3d Cir.1981); *In re Application of National*

*Broadcasting Co. (United States v. Myers),* 635 F.2d 945 (2d Cir.1980); *In re Application of KSTP Television,* 504 F.Supp. 360 (D.Minn. 1980). Law review commentary includes Note, *Copying and Broadcasting Video and Audio Tape Evidence: A Threat to the Fair Trial Right,* 50 Fordham L.Rev. 551 (1982).

cases turned on each court's assessment of the importance of public access to judicial records in the face of the possible detrimental impact on criminal trials of disclosure. Because the Supreme Court's decision in *Warner Communications* fails to provide guidance on how this assessment should be made, the courts of appeals have announced widely varying formulations.

At one extreme, that most favoring access to judicial records, is the decision of the Second Circuit in *In re Application of National Broadcasting Co. (United States v. Myers)*, 635 F.2d 945 (2d Cir.1980) ("*Myers*") (affirming district court's grant of an application to copy during trial). *Myers* held that only "the most extraordinary circumstances" would justify denial of an application to copy evidence admitted at a criminal trial. Under the *Myers* approach, the public's interest in criminal trials easily outweighs the potential prejudicial effects of publicity, even as to defendants who are yet to be tried on other indictments arising from the same undercover investigation.

At the other extreme is the decision of the Fifth Circuit in *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423 (5th Cir.1981) (affirming denial of tape copying access by district court). *Belo* held that access should always be denied when a court is asked to balance the "non-constitutional right of physical access to courtroom exhibits and a defendant's due process right to a fair trial." *Id.* at 432. "It is better to err, if we must, on the side of generosity in the protection of a defendant's right to a fair trial before an impartial jury." *Id.* at 431.

■ The three other circuits that have addressed this issue have not found it capable of simple resolution by sweeping language. Instead, each of these courts has found that the common law right of access is of the same stature as the threats posed by disclosure. Accordingly, each of these courts has held that a decision on an application to copy can be reached only by balancing these two competing interests in light of the circumstances in the particular case in which copying is sought. Each of these courts adopted an approach that

starts with a "strong presumption" that access should be allowed, which may be overcome upon a finding of "articulable facts" supporting denial because of the nature and gravity of the harms threatened by disclosure. *See United States v. Edwards ex rel. Application of Video-Indiana, Inc.*, 672 F.2d 1289, 1294 (7th Cir.1982) (affirming district court's denial of access during trial); *In re National Broadcasting Co.*, 653 F.2d 609, 613 (D.C.Cir.1981) ("*In re NBC*") (reversing district court's denial of access during trial); *United States v. Criden ex rel. Application of National Broadcasting Co.*, 648 F.2d 814, 823 (3d Cir.1981) (reversing district court's denial of post-trial access to tapes).

Under these decisions, unsupported hypothesis or conjecture does not rise to the level of "articulable facts" required to support a denial of access. *Edwards*, 672 F.2d at 1294. *See In re NBC*, 653 F.2d at 618 (risk of potential prejudice at hypothetical second trial insufficient to support denial of access). Moreover, the potential harm must not be capable of resolution by a means less drastic than denial of access. *Edwards*, 672 F.2d at 1296 (cautionary instruction to jury appropriate to alleviate concern that jury would interpret granting of access as judicial endorsement of the evidence); *In re NBC*, 653 F.2d at 620 (excision of tapes would eliminate possible harms to third parties mentioned in tapes); *Criden*, 648 F.2d at 827–28 (voir dire could be used to eliminate jurors who had been biased by publicity at possible retrial).

In the absence of any controlling precedent from the Ninth Circuit, I choose to follow the approach adopted by the Third, Seventh, and D.C. Circuits. I believe that this approach most closely follows the command of *Warner Communications*. There, the Supreme Court initially affirmed the existence of a common law right of access, and held that resolution of controversies implicating this right must be resolved by weighing the interests advanced. This approach—whether or not it is labelled the "strong presumption" approach as other circuits have done—is also consist-

ent with this Circuit's approach in determining whether a criminal proceeding should be closed to the public and the proper allocation of the burden of making the required showing. In *United States v. Brooklier,* 685 F.2d 1162, 1167 (9th Cir. 1982), the court held that one who seeks closure may discharge the burden of showing necessity to protect the fair trial guarantee by demonstrating a "substantial probability" that the protected right will be harmed. The value to be protected in that case, that "the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole," *id.* (*quoting* from *Globe Newspaper v. Superior Court,* —— U.S. ——, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982)), is the same as the value to be protected here. Thus, whether labelled a "strong presumption" or a requirement that the right of access may be denied only on a showing of a "substantial probability" that the defendant's right to a fair trial will be impaired, what is required is a careful balancing of the value to be served by free access to public judicial records against the harm which can be articulated to result from such access.

The approach advocated by the Fifth Circuit in *Belo* undervalues community access to criminal proceedings. While it was decided on a Constitutional basis not applicable here, the values underlying the Supreme Court's decision in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), must be considered in deciding NBC's application. In his plurality opinion in *Richmond Newspapers,* Chief Justice Burger stressed the "significant community therapeutic value" of public trials and that "especially in the administration of justice, the means used to achieve justice must have the support derived from public acceptance of the process and its results." *Id.* at 570–71, 100 S.Ct. at 2823–

24. These goals are served by expanding the nature and scope of the public's access to criminal proceedings—including allowing the press to copy and disseminate evidence introduced in a non-printed form. The public's interest in and access to criminal proceedings should be fostered to the extent that this can be done without infringing the defendant's due process right to a fair trial. I decline to follow the "most extraordinary circumstances" test of the Second Circuit, however, because it suggests too little concern for the defendant's rights.

█ Accordingly, I turn to the facts of this case to decide whether the "strong presumption" in favor of copying access is overcome by harms that are not merely conjectural and that are not capable of cure by remedies other than a denial of access. Stating the same test differently, the issue is whether defendants have demonstrated a "substantial probability" that the grant of access will cause articulable harm to their right to a fair trial or some other protected right.

## II.  FACTUAL ANALYSIS

*Warner Communications* discusses a variety of factors that may be appropriate in deciding whether to allow access to judicial records.[2] In some cases, allowing access to records may be particularly important because access would enhance public understanding of an "important historical occurrence." *Id.,* 435 U.S. at 602, 98 S.Ct. at 1314. This factor influenced some of the courts deciding applications made in cases arising from the ABSCAM undercover investigation of corruption of government officials.[3] In another decision on an application for access to copy a videotape, the court decided not to allow copying because the videotape depicted the victim of a crime in a humiliating and degrading fashion. *See In re Application of KSTP Television,* 504 F.Supp. 360 (D.Minn.1980).

---

**2.** For a complete listing of the factors from *Warner Communications, see Edwards,* 672 F.2d at 1293.

**3.** The decisions in *Edwards, In re NBC, Criden,* and *Myers* were issued in cases arising from

the ABSCAM investigation. The *Belo* decision was rendered in a case involving a prosecution after another undercover investigation of official corruption ("BRILAB").

In most cases in which applications to copy tape evidence will be made, there will be no special public interest in access to the evidence other than the important interest in and therapeutic value from public criminal trials. Also, in most cases, the only cognizable interest that could be damaged by access is the defendant's interest in a fair criminal trial. In this case, these are the only two interests that are implicated.[4] In particular, there are two dangers that must be assessed in determining whether the "strong presumption" that supports NBC's application is overcome in this case: (1) whether the currently empaneled jury will be prejudiced by publicity generated if the tapes are copied; and (2) whether it would be impossible to select an impartial jury for a second trial of this case—either for the trial of the severed defendant or for a retrial of some or all of the defendants in the current action.[5]

### 1. *Possibility of Prejudicing the Current Jury*

Defendants' principal contention in opposing NBC's application is that they will be denied their Sixth Amendment right to trial by an impartial jury if copying and dissemination of the tapes is allowed. Defendants argue that the publicity based on the tapes will have a disproportionate impact on jurors because of the strong impact of television broadcasts,[6] the timing of the release of the tapes, and the unreliability of taped evidence that is "manufactured" by the prosecution.

All of these objections rest on a speculative assumption that the jury, which already has been empaneled, will not abide by this Court's admonition to avoid all publicity about this case until the completion of trial. The jurors have received an instruction that they are to reach their decision solely on the basis of evidence presented in court—and that this is the reason that they must avoid all publicity about this case. Confidence that jurors will obey instructions of the court is an underpinning of our criminal justice system. In this case in particular, the jurors were asked extensive *voir dire* questions by the defendants' attorneys to ensure that the jurors understood this responsibility. There is no reason to believe that the jury will disobey this Court's instruction to avoid publicity any more than there is a basis for believing that the jury will disregard other instructions. "[The Court is] entitled to rely on the jury's observance of [the] admonition to avoid exposure to reports of the trial in the news media." *Myers*, 635 F.2d at 953.

Moreover, even exposure by some members of the jury to media publicity about this trial would not necessarily pose a significant risk to a fair trial. Not only will the jury be reminded repeatedly of its obligation to avoid all publicity about the case, but it also will be reminded that only its assessment of the importance of each piece of evidence is controlling. *See Edwards*, 672 F.2d at 1296.

It may well be that there are cases in which it would be foolish to expect a jury to obey an admonition to ignore media coverage of a trial that has become a media-inspired circus. In such cases, a change of venue, postponement of trial, or sequestration of the jury may be appropriate. *See Sheppard v. Maxwell*, 384 U.S. 333, 357–62, 86 S.Ct. 1507, 1519–22, 16 L.Ed.2d 600 (1966). There also may be cases in which allowing access to taped evidence would be fanning the flames of media interest and inviting pervasive publicity. This case is not of either of these varieties. The case is not so noteworthy and the taped evidence is not so intrinsically fascinating. While the

---

4. Defendants also have argued that access to copy the taped evidence is prohibited by Rule 29 of the Local Rules of the Central District of California. This argument is without merit. That rule does not address the issues raised by NBC's application and does not limit this Court's discretion in this matter.

5. In terms of the *Brooklier* test, the issue is whether defendants have demonstrated a "substantial probability" on articulable facts that either of these two dangers exists.

6. Obviously, this objection is relevant only to the release of videotape evidence, and not to audio tapes.

indictment charges defendants with involvement in transactions totalling tens of millions of dollars, it has become the unfortunate situation that indictments charging violations of narcotics laws involving such large sums are no longer uncommon. Although many counts of the indictment are based on currency reporting requirements that may not be used often to charge narcotics-related offenses, this case is not otherwise distinguishable in the public eye from many other narcotics-related conspiracies.[7] The publicity surrounding this case to date has involved relatively few reports. There is no reason to anticipate pervasive or prejudicial media coverage of this case during trial.

### 2. Selecting an Impartial Jury for Future Trials

In most of the decisions on applications to copy taped evidence, any concern about the difficulty of selecting a second impartial jury arose from the possibility of a mistrial or reversal on appeal. Three of the courts of appeals' decisions dismissed this possibility as too remote to justify denial of an application for tape copying. *In re NBC,* 653 F.2d at 615–18; *Criden,* 648 F.2d at 827; *Myers,* 635 F.2d at 954. To the extent that defendants' opposition to NBC's application rests upon the possibility of a mistrial or retrial, I agree that such speculation is insufficient to overcome the strong presumption supporting the application. Were a retrial to be required, no showing has been made of a substantial probability that *voir dire* questioning would not be effective in identifying and eliminating any prospective juror with a lingering, prejudicial perception of the case.

In this case, however, there is not just a speculative possibility of a second trial on this indictment. One of the co-defendants was severed at the outset of this trial, and his trial will follow the current trial. Despite this impending trial, I do not find that there is a sufficient likelihood—any substantial probability—of prejudice to the severed defendant to justify denial of NBC's application.

This conclusion is reached on the basis of this Court's experience in selecting the first jury in this action. That jury was selected on the days immediately following publication of much of the publicity that this case has attracted. Despite this concurrent publicity, only four of the sixty-six panel members called to the jury box had any knowledge of the case. Only one of these four had sufficient knowledge to warrant his excusal for cause. This experience demonstrates that this case has not been—and is unlikely to become—the kind of case in which it will be difficult to select an impartial jury. The trial of the severed defendant will occur many weeks after the prosecution's presentation of its case (including the taped evidence) at the first trial. Because the media are likely to broadcast the tapes upon their release, if at all, it should not be difficult to select jurors for the second trial who have no prejudicial memories of any publicity about the first trial.

### ORDER

Because the possible harm that may arise from media dissemination of the taped evidence in this case is insubstantial and entirely speculative, NBC's application to copy the video and audio tapes admitted into evidence is granted.[8]

---

7. One factor which has distinguished this case in the eyes of the press is the maternal status of some of the defendants. Early press reports have referred to the case as the "Grandma Mafia" case.

8. At the hearing on NBC's application, the government inquired of possible requests by others if this application were granted. I do not rule on any applications which are not before me.