In re Application of CBS, INC., Applicant.

UNITED STATES of America, Plaintiff,

v.

Anthony SALERNO, et al., Defendants.

Misc. No. 62 (MJL).
No. 86 Cr. 245 (MJL).

United States District Court, S.D. New York.

July 2, 1987.

Ronald E. Guttman & Douglas P. Jacobs by Ronald E. Guttman, Laura V. Jones, New York City, for applicant CBS, Inc.

James, Millert, Houdek, Tyrl & Sommers by Bruce C. Houdek, Millin, Trader & Jackson by F. Russell Millin, Kansas City, Mo., for deponent Roy L. Williams.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

CBS, Inc. ("CBS") moves for permission to copy the videotaped deposition of Roy L. Williams (the "Deposition Videotape"), which was shown to the jury in the criminal case currently being tried before this court (the "Salerno Case") in lieu of Williams' live testimony.[1] Williams opposes the release of the Deposition Videotape, which CBS wants for "possible broadcast to the public." (Memorandum of Law of CBS In Support of Application ("CBS Br."), p. 1). Defense counsel in the criminal action have also made their objections known, though they have not submitted formal papers. (Transcript dated June 2, 1987 ("June 2 Tr."), pp. 4298–4311; Transcript dated July 1, 1987 ("July 1 Tr.")).[2]

## BACKGROUND

In connection with the Salerno Case, the government moved, on February 25, 1987, for authorization to take a videotaped deposition of Williams under Rule 15 of the Federal Rules of Criminal Procedure. The government stated that a Rule 15 deposition was necessary to preserve material testimony due to Williams' potential unavailability at the upcoming trial. (Affidavit of Mark R. Hellerer ("Hellerer Aff."), ¶¶ 2–7).

Williams, former General President of the International Brotherhood of Teamsters (the "Union"), was incarcerated at the Federal Medical Center for Prisoners at Springfield, Missouri as a result of a conviction on an unrelated case. The government represented that Williams was severely ill and that any attempt to bring him to New York "could be life-threatening." (Hellerer Aff., ¶ 4). Williams' treating physician characterized the deponent's health as follows:

> Mr. Williams is approximately 71 years of age, and ... suffers from multiple medical ailments including severe emphysema and pulmonary hypertension. Mr. Williams currently has less than twenty-five percent of normal lung capacity and suffers from extreme shortness of breath. He is attached to an oxygen machine at all times to assist him in breathing. In addition, he must take medication in the form of a number of inhaled and oral bronchodilators. Mr. Williams has been confined to his hospital room at Springfield since December, 1985. He is unable to walk more than a few steps and can only be moved by wheelchair, while attached to his oxygen machine.

(Hellerer Aff., ¶ 4).

Defense counsel raised no objection to the deposition[3] and on March 5, 1987, this court granted the government's application. (March 5 Tr., p. 58).

Williams was deposed in the prison medical center for three days beginning March 16, 1987. He asserted his Fifth Amendment privilege against self-incrimination

---

**1.** After receiving a letter request for the release of the Deposition Videotape, this court instructed counsel for any interested broadcasters to file a miscellaneous case as related to the pending criminal case and to formally move for the relief sought. (Transcript dated June 9, 1987 ("June 9 Tr."), p. 4951). The dispute has been assigned Miscellaneous Number 62 and this court has accepted it as related to *United States v. Anthony Salerno, et al.*, 86 Cr. 245 (MJL). CBS brought on the instant application by Order

to Show Cause returnable on June 27, 1987. A hearing was held by this court on July 1, 1987.

**2.** The July 1 proceeding was not yet transcribed as of the time of this writing. Page references to that transcript have therefore been omitted.

**3.** Objection was made to videotaping. (Transcript dated March 5, 1987 ("March 5 Tr."), pp. 56–57.

and was compelled to testify as a result of the government's promise to provide him with use immunity under 18 U.S.C. § 6002 et seq. (Unredacted Transcript of Deposition Videotape ("Unredacted Tr."), p. 9).

Williams was never asked to consent to the release of the Deposition Videotape to the media for local or national television broadcast to the public. (June 2 Tr., p. 4303; July 1 Tr.).

The Deposition Videotape reflects the severity of Williams' continuing illness. He appeared in a wheelchair attached to an oxygen machine which permitted him to breathe by virtue of surgical tubes connected to his nose. His difficulty breathing increased as he testified and became fatigued. The proceedings were punctuated by frequent fits of coughing requiring Williams to stop and use an oral bronchodilator. Unable to testify for long periods of time, Williams was regularly permitted to rest. He wore a hospital gown and had difficulty hearing the questions he was asked.

The Videotape Deposition was shown to the jury in the Salerno Case on June 1 and 2, 1987. The courtroom was open to the public and the press on those days as on every other day. Television monitors could be viewed by the spectators. The government provided redacted copies of the 230 page deposition transcript to the members of the press.

### DISCUSSION

This case raises two main questions: (1) Does the public have a common law right to copy and broadcast a videotaped deposition of a witness whose live testimony was precluded by his severe illness?; and (2) If the common law right attaches, are the witness' privacy concerns sufficiently extraordinary to overcome the presumption in favor of access?

*I. Scope of the Common Law Right*

■ There is no dispute that the public enjoys a common law right to inspect and copy judicial records, including exhibits. *See Nixon v. Warner Communications, Inc.*, 435 589, 597, 98 S.Ct. 1306, 1311, 55 L.Ed.2d 570 (1978). The parties disagree about whether the right encompasses videotaped depositions. The question has not yet been decided in this circuit.

CBS argues that any videotape admitted in evidence at a criminal trial is subject to the common law presumption in favor of public inspection and copying. (CBS Br., p. 3).[4] Relying primarily on the Second Circuit's decision in *United States v. Myers*, 635 F.2d 945 (2d Cir.1980), CBS asserts that the content and purpose of the videotape does not and should not affect the media's access to it. (*See* Reply Memorandum of Law of CBS In Support Of Application ("CBS Reply Br."), p. 6).

CBS asks this court to exalt form over substance. The cases upon which CBS relies arose out of two investigations into public corruption: ABSCAM and Watergate. All the cases involve access to video and audio tapes of real evidence which depict or reflect the actual participation of one or more defendants in the criminal conduct of which they are accused. *See Warner Communications*, 435 U.S. 589, 98 S.Ct. 1307; *Myers*, 653 F.2d 945; *In re Application of National Broadcasting Co.*, 653 F.2d 609 (D.C.Cir.1981); *United States v. Criden*, 648 F.2d 814 (3d Cir. 1981). As Williams points out, none of the cases involve "a witness whose testimony was taken pursuant to Rule 15 due to the condition of his personal health." (Response to Order to Show Cause and Suggestions In Opposition to Application of CBS Inc. to Copy Videotapes of Roy L. Williams Deposition ("Williams' Br."), p. 3).

**4.** CBS does not seek to base its position on the First Amendment, recognizing that *Warner Communications*, 435 U.S. 589, 98 S.Ct. 1307 precludes a constitutional claim in this case. CBS does take the position, however, that were the Supreme Court to address the issue again after its decision in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65

L.Ed.2d 973 (1980), the Court would establish a First Amendment right to copy videotaped evidence. (July 1 Tr.). We do not believe that this case implicates the First Amendment under current law. The press was present in the courtroom, saw the Deposition Videotape at a public trial and received copies of the transcript.

In the only case on point, the court rejected the media's claimed common law right of access to a videotaped deposition. In *Application of American Broadcasting Companies, et al.*, 537 F.Supp. 1168 (D.D.C.1982), the court denied the broadcast media's access to actress Jodie Foster's videotaped Rule 15 deposition after its introduction in evidence as part of the government's case in *United States v. John W. Hinckley*. The court distinguished the release of the ABSCAM and Watergate tapes which "constituted real evidence of the activities of a criminal defendant." *American Broadcasting Companies*, 537 F.Supp. at 1171. The court reasoned that it was:

> logical that Miss Foster's taped testimony should be treated in the same fashion as the testimony of any witness at trial—namely, the testimony is displayed to the jury, which can hear and view it but not record it. The common law right of access has never been held to include the right to televise, photograph, or make aural recordings of trial testimony ...

*American Broadcasting Companies*, 537 F.Supp. at 1171 (citations and footnotes omitted).

■ We are persuaded by the distinction. CBS seems to imply that Williams' testimony is somehow different from Jodie Foster's because Williams was not an "innocent victim." (CBS Reply Br., p. 18). Rather, CBS contends, Williams testified about his participation in criminal conduct. The argument is without merit. Williams, like Foster, gave "mere testimonial evidence, a description ... of events within [his] knowledge." *American Broadcasting Companies*, 537 F.Supp. at 1171. He is not on trial in the Salerno Case. The Deposition Videotape is not itself evidence of any crime.

There is no question that had Williams been physically capable of appearing at trial, CBS would not have been permitted to film, photograph or tape his testimony. *See* Fed.R.Crim.P. 53; Local Court Rule 7; Report of the Judicial Conference Ad Hoc Committee On Cameras in the Courtroom (September 6, 1984) (the "Conference Report"). We see no reason to subject a witness to local or national television exposure simply because he was too sick to fly to New York and the government chose to make its case on videotape. The deposition room in Missouri was simply an extension of the southern district courtroom.

Moreover, if Williams had been informed that videotaping might expose his present physical condition to thousands of people across the country, he might have objected to that procedure. The government could easily have relied upon a written or aural record.

CBS argues that *American Broadcasting Companies* was wrongly decided. (CBS Reply Br., p. 3). According to CBS, the judiciary's refusal to permit televised trials is meant to "protect the decorum of the trial proceeding." (CBS Reply Br., p. 10). If a witness is taped prior to trial, no disruption of the courtroom need occur by releasing the videotape and effectively permitting the media to televise witness testimony.

CBS properly looks to the purpose behind the general ban on filming or broadcasting federal trial proceedings. It has, however, understood that purpose too narrowly. CBS has confused concern with the trial process with concern for only what physically happens inside a courtroom from the time a jury is empaneled to the time the foreperson reads the verdict.

In 1984, the Judicial Conference denied a request by media representatives to lift the existing ban on photographing and broadcasting federal court proceedings. The decision was based, at least in part, on the risks perceived in the psychological effects of such broadcasting on jurors, witnesses, lawyers and judges. (Conference Report, pp. 5–7). The conference participants understood that witnesses see cameras as the eyes of "a greatly extended, indefinite, and unseen viewing audience." (Conference Report, p. 7). Whether the camera is inside a courtroom or inside a prison; whether it's turned on before or during a trial, the witness is aware that the "public" is watching. Such knowledge, as the conferees recognized, "may encourage witnesses to become more interested in how their testimony will appear to friends, acquaint-

ances, and a vastly increased audience, than in the accuracy of their testimony." (Conference Report, p. 6).

As did the Judicial Conference, the *Myers* court indicated its concern with the effect of the witness' awareness of broad public exposure on the trial process, not simply with the physical presence of cameras in a courtroom. The circuit distinguished the copying of "physical evidence" from the broadcast of live witness testimony as follows:

With physical evidence, there is no concern that awareness of dissemination of sight and sound beyond the courtroom might have some distorting impact upon the content of the evidence or the manner in which it is presented to the jury.

*Myers*, 653 F.2d at 952 n. 5.

Individuals who are filmed as part of an undercover investigation, such as AB-SCAM, are not aware that their actions and words are being recorded. Widespread media distribution of undercover video surveillance tapes, therefore, poses no threat that the "actors" will obscure the truth by playing to their audience. The witness who testifies at a videotaped deposition, however, is very much aware that he or she is being filmed. The knowledge that the witness' performance will be viewed by thousands or even millions of people who watch the evening news may well have the feared psychological effect.[5]

We hold that the public's common law right of access to judicial records does not require the release for broadcast of a videotaped deposition of a witness.

## II. The Witness' Privacy Concerns

[3] Even if the public were entitled to copy and broadcast the videotaped testimo-ny of a Rule 15 deponent, that right is not absolute, under *Myers* or common law doctrine.

In *Myers*, the court established a presumption in favor of access to physical evidence once it "has become known to the members of the public, including representatives of the press, through their attendance at a public session of court." *Myers*, 635 F.2d at 952. Restrictions on that access may be justified upon a showing of "extraordinary circumstances." *Id.* The court did not define what circumstances would be considered "extraordinary."

CBS acknowledges that the privacy of "passive third partie[s]" and "innocent victims" may be "protected in the extreme case." (CBS Reply Br., p. 18) (citing *American Broadcasting Company*, 537 F.Supp. at 1172 and *In Re Application of KSTP*, 504 F.Supp. 360 (D.Minn.1980)). CBS contends, however, that Williams is not entitled to such protection because he "confess[es] to involvement in a scheme by organized crime to control the Teamsters' Union." (CBS Reply Br., p. 18). Leaving aside the accuracy of that assertion, we do not believe that Williams, who has not been indicted in the Salerno Case but who is a federal prisoner, is entitled to any less dignity than any other human being.[6]

Williams was compelled to testify. He had no interest in the form in which the deposition was recorded. Rather, the government desired videotaping to "best preserve the jury's opportunity to consider the witness' demeanor." (Hellerer Aff., ¶ 7; July 1 Tr.). Williams was not advised that there was a chance that the Deposition Videotape would be released for television

---

5. The fact that Williams was unaware that his deposition might be televised does not provide a basis for release of the tape in this case. Once a videotaped Rule 15 deposition is released, the possibility that other witnesses will be similarly exposed becomes concrete. That possibility is sufficient to distort future videotaped witness testimony. Moreover, since Williams was unaware and could not be expected to have anticipated that his videotaped deposition would be the first one to be released to the television media, he had no opportunity to object to being filmed. It is not disputed by the government

that the release of videotaped witness deposition testimony to television would cause future witnesses to resist taping and have a negative impact on the quality of the government's presentation to juries. (July 1 Tr.).

6. Even if Williams were a defendant in this case, common decency requires that he be treated in accordance with at least certain privacy interests. *See Tribune Review Publishing Co. v. Thomas*, 153 F.Supp. 486, 494–95 (W.D.Pa.1957).

broadcast. Nor would he have had any reason to anticipate that result. We need not reiterate the details of Williams' illness or his appearance on the tape. While the court has the power to compel testimony, it also has an obligation to protect his dignity.

Considering his humanity, the extreme vulnerability of his situation and the inevitable effect of his ill health upon his appearances, we believe that Williams' privacy interests rise to the level of "extraordinary."

To summarize, this court finds that the public's common law right of access to judicial records does not require the release for television broadcast of a videotaped Rule 15 deposition of a witness who was too ill to testify at trial. Furthermore, even if the common law right encompassed videotaped witness depositions which have been compelled, the witness' privacy concerns are sufficiently extraordinary to restrict access in this case.

It Is So Ordered.