**UNITED STATES of America, Plaintiff,**

v.

**Stephen PAGEAU and Leonard Welch, Defendants.**

**No. 81–CR–85.**

United States District Court, N. D. New York.

March 12, 1982.

---

George H. Lowe, U. S. Atty., Syracuse, N. Y., for plaintiff; David R. Homer, Asst. U. S. Atty., David B. Adler, Atty., Criminal Section, Civil Rights Division, Dept. of Justice, of counsel.

Paul V. French, Albany, N. Y., for defendant Stephen Pageau.

Rowley & Forrest, Albany, N. Y., for defendant Leonard Welch; Thomas Forrest, Mark T. Walsh, Jr., Albany, N. Y., of counsel.

Robert P. Roche, Albany, N. Y., for WNYT–TV, Channel 13 and WPTZ–TV, Channel 5.

Robert Abrams, Atty. Gen. of New York, Albany, N. Y., for Thomas A. Coughlin, III, Commissioner of New York State Dept. of Correctional Services; David B. Roberts, Albany, N. Y., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### BACKGROUND

Defendants, Corrections Officers employed by the New York State Department of Correctional Services at the Clinton Correctional Facility, Dannemora, N. Y., were charged in a single count indictment with violation of 18 U.S.C. § 242. According to the indictment, the defendants deprived John Eng, an inmate of the facility, of rights protected by the Constitution and laws of the United States, in that they "did, aiding and abetting each other, willfully strike, beat and assault John Eng . . ." on July 5, 1980. A portion of the incident described in the indictment was recorded on videotape. An application by defendants for closure of a pretrial hearing to determine the admissibility of the videotape was denied, an open pretrial hearing was held, and a determination was made to allow the videotape, including the sound portion thereof, to be received in evidence. *U.S. v. Pageau and Welch*, 526 F.Supp. 1221, 1224 (N.D.N.Y.1981). However, since the decision as to admissibility was not made until after the hearing, the public and the press were denied the right to inspect and copy the tape prior to trial, although they were able to view the entire recording, as displayed on several monitors in the courtroom, during the course of the hearing.

Trial was commenced on February 10, 1982 and continued over a period of five days. (February 10, 11, 12, 16 and 17). The jury commenced deliberations immediately after instructions by the Court on February 17. Deliberations extended over a period of three days. (February 17, 18, 19). On February 19, a juror became ill and could not continue to participate in the deliberations.[1] Upon inquiry by the Court, the Foreman reported that the jury was unable to agree

---

1. Although the Government was willing to stipulate that deliberations continue with eleven jurors participating, the defendants were not. Fed.R.Crim.P. 23(b).

on a verdict in any event. Accordingly, a mistrial was declared and the jury was discharged. A tentative date for retrial has been set for May 5, 1982.

Aware of media interest in the videotapes,[2] defendants have moved by Order to Show Cause to prevent the dissemination of the tape pending a final disposition of the indictment. That application, following a hearing held on March 4, 1982 as directed by the Order to Show Cause, presently is before the Court for determination. Although not formally permitted to intervene, the Commissioner of the New York State Department of Correctional Services, represented by the New York Attorney General, was allowed to produce witnesses and to advance his argument in opposition to the application at the hearing. The Government has taken no position in the matter; however, the Assistant U.S. Attorney present at the hearing, in response to an inquiry by the Court, opined that the law favors the media's position.

## DISCUSSION

Defendants urge that the dissemination of the videotapes will expose potential jurors to a sensational and inflammatory segment of the incident in which they were involved with inmate Eng, thereby prejudicing their right to a fair retrial.[3] The Commissioner of Correctional Services argues that broadcasting of the tape "would pose a very real and immediate risk of a violent disturbance if and when inmates in the custody of the Department view this videotape in the media." (Para. 11, Affidavit of Deputy Commissioner William Gard).

This Court finds no significant distinction between the claims of prejudice presented

by the defendants here and the claims presented and rejected in *In re Application of National Broadcasting Co. v. Myers*, 635 F.2d 945 (2d Cir. 1980). There, the potential harm arising out of the possible retrial of the defendants after appeal, and the potential harm to other "Abscam" defendants yet untried, were weighed against the general right to inspect and copy public records and documents. *See Nixon v. Warner Communications Co., Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). In allowing the release of the videotapes received in evidence at the trial, the *National Broadcasting* court concluded that there is a presumption in favor of public inspection and that "it would take the most extraordinary circumstances to justify restrictions on the opportunity of those not physically in attendance at the courtroom to see and hear the evidence, when it is in a form that readily permits sight and sound reproduction." *In re Application of National Broadcasting Co., supra*, 635 F.2d at 952.

■ No such extraordinary circumstances have been revealed here. Although many persons in the Northern District would be exposed to the videotape, a careful voir dire examination of prospective jurors is a less restrictive means than suppression of the tape to guarantee a fair trial. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *United States v. Edwards*, 430 A.2d 1321 (D.C.App.1981). Moreover, there is a tendency to overestimate the public awareness of the news, *see U.S. v. Haldeman*, 559 F.2d 31, 61–63 n.37 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), and it cannot be assumed that jurors will ignore the Court's instructions to

---

**2.** Television stations WPTZ–TV, Channel 5, Plattsburgh, New York and WNYT–TV, Channel 13, Albany, New York requested permission to copy the tape. The first request was received five days after the jury was discharged. The Court immediately advised the attorneys for the defendants of its intention to release the tape. However, release was stayed pending the March 4, 1982 hearing, and the tape has yet to be copied by any representative of the media.

**3.** Although the tape depicts defendant Pageau striking the inmate a number of times with his nightstick and also depicts defendant Welch kicking the inmate on one or more occasions, it is conceded that the incident had its inception when inmate Eng, upon leaving his cell in the Special Housing Unit, grabbed defendant Welch by the throat, an event not shown on the tape. Accordingly, the issue of intentional use of excessive and unnecessary force has been raised.

render a verdict solely upon the evidence presented in the courtroom.[4] The adverse effects of pretrial publicity may, in a proper case, be countered by the grant of a continuance or change of venue. *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). The possibility of prejudice in jury selection is not a sufficient foundation for the relief sought by defendants here.[5]

The testimony given on behalf of the Commissioner of Correctional Services by Eugene S. LeFevre, Superintendent of the Clinton Facility, and by Everett W. Jones, Superintendent of the Great Meadow Facility, was not persuasive. Both described the problems of prison overcrowding and the high incidence of violence in their facilities. Mr. LeFevre described conditions in his prison as a "tinderbox" and indicated that the showing of the videotapes to the inmates would be inflammatory and might lead to a riot. Mr. Jones testified that a showing at his facility would serve to heighten tension between inmates and employees and that the likely result would be a disturbance of some kind. These prison custodians conceded that the events shown on the videotape would be available to the prison populations through newspapers and radio in any event, but they opined that a pictorial representation of the events would make an important difference in leading to the catastrophic results they predicted.

■ It appears to the Court that the Commissioner and his subordinates have made an unwarranted concession of powerlessness in this situation. They are, after all, in charge of the prisons and have appropriate means of control at their disposal, including the simple expedient of shutting off the television sets available to the in-

mates.[6] In the opinion of the Court the Commissioner has failed to make the clear and convincing showing of extraordinary circumstances necessary to overcome the presumption favoring disclosure mandated by *National Broadcasting.*

### CONCLUSION

The application is denied in all respects. However, the stay heretofore granted will be continued until March 23, 1982.

It is so Ordered.

---

4. Given the Court's authority to so instruct the jury, and given the further authority to sequester the jury if necessary, there seems to be no reason why videotapes introduced in evidence should not be available to the media *during the course of the trial. U.S. v. Maddox*, 50 U.S. L.W. 2499, citing 7 Media Law Reporter 2600 (S.D.Fla.1981).

5. The possibility of prejudice in jury selection does form such a foundation in the 5th Circuit.

*Belo Broadcasting Corp. v. Clark*, 654 F.2d 423 (5th Cir. 1981) (aff'g the determination of the District Court in refusing to release "Brilab" tapes).

6. The television stations opposed to the application at bar have agreed to notify the prison authorities of the date and time when the videotape will be shown.