**UNITED STATES of America, Plaintiff,**

v.

**Norman SAUNDERS, et al., Defendants.**

**No. 85–165–Cr.**

United States District Court,
S.D. Florida,
Miami Division.

March 21, 1985.

Richard Gregorie, Asst. U.S. Atty., Miami, Fla., for U.S.

Philip Carlton, Jr., Miami, Fla., for Stafford Messick.

Michael Von Zamft, Hialeah, Fla., for Aulden Smith.

Louis St. Laurent, II, Miami, Fla., for Andre Fournier.

Albert Kreiger, Susan Von Dusen, Neal R. Lewis, Miami, Fla., for Norman Saunders.

MEMORANDUM OPINION AND ORDER GRANTING MOTION TO PERMIT COPYING OF TAPE RECORDING ADMITTED IN EVIDENCE

SPELLMAN, District Judge.

The National Broadcast Company ("NBC"), Sunbeam Television Corporation ("Sunbeam"), the American Broadcasting Company ("ABC"), the Post-Newsweek Stations of Florida ("Post Newsweek") and the Miami Herald Publishing Company ("Miami Herald") have moved this Court for an Order permitting them to inspect and copy the videotape played in open court and introduced as evidence at the bond hearing in the above-styled case. For the reasons set forth below, the motions for access and copying the videotape are GRANTED.[1]

## BACKGROUND

On March 5, 1985 United States Drug Enforcement Administration ("DEA") agents arrested Norman Saunders, Chief Minister of Turks and Caicos Islands,[2] Stafford Messick, the Minister of Commerce of the Turks and Caicos, Aulden Smith, the sub-Minister of Transportation of the Turks and Caicos, and Andre Fournier, a Canadian businessman, on charges of conspiracy to import and distribute cocaine.

The following day, a bond hearing for all four Defendants was held before United States Magistrate Herbert Shapiro. At the hearing, the Government offered in evidence certain portions of a videotape of the activities of the Defendants and of a cooperating individual at a motel in Miami. The scenes depicted the Defendant, Norman Saunders, receiving, counting, and then pocketing sums of money contended by the Government to be bribes for permitting the airfield at Turks and Caicos Islands to be used as a stopover for planes loaded with cocaine flying from Colombia to the United States. Other scenes were of Andre Four-

nier talking to the other Defendants and to the cooperating individual of the setting aside of 10% of the proceeds to be received by the co-conspirators to be used as a slush fund for bonds and attorneys fees and of the use of a mountain hideaway in Colombia.

The tape was played in open court and admitted as evidence by the Magistrate. None of the Defendants filed a closure motion. Members of the media sketched the tape as it was played on a portable television monitor in the Magistrate's courtroom. These sketches were broadcast on the March 6, 1985 11:00 p.m. local news report of Sunbeam's WSVN Television. A description of the contents of the tape was provided by *The Miami Herald* in a story on March 7, 1985 and by the Associated Press in a wire story transmitted March 6, 1985.

Post-Newsweek, Sunbeam, WBC, and NBC all applied to the Magistrate for an order permitting the copying of the videotape which was introduced as evidence in the bond hearing. The United States Attorney's Office, consistent with its position in other cases of this type, stated that it had no objection to the media's application. The Defendants, however, objected. They contended that the rebroadcast of the tapes would so prejudice the public that it will be impossible to find impartial jurors. They further argued that they were entitled to be indicted by an unbiased grand jury and that broadcast of the tape prior to indictment may jeopardize this right.

On March 11, 1985, the Magistrate entered the Order which denied the media access to the tape. The Magistrate found that:

... in the interest of a fair and impartial administration of justice, and of the rights of the accused to a presentment before an unbiased grand jury, and im-

---

1. The movants further requested that this Court enter an Order permitting them to simultaneously copy all video or audio tape recordings which are introduced into evidence during any subsequent proceeding in this cause. At oral

argument, the Court denied this request without prejudice to its renewal at a later time.

2. The Turks and Caicos Islands are in the British West Indies and are under British dominion.

partial grand jury (should the Government determine to make such a presentment) as to which only evidence presented before all assembled together is to be received and considered, and further inasmuch as there is no voir dire or other control over such Grand Jury ... and purely as a prophylaxis and precautionary bases, this Court will not authorize the release of the videotapes prior to the indictment....

Order at 9.

Although the ground for denying the application was based upon the fact that the defendants had not yet been indicted, the Magistrate stated that, in his opinion, when the equities were balanced, "the right of the public to information as against the rights of the individual to a fair and impartial trial" ... would negate the rebroadcast of the videotapes prior to trial. The Magistrate recognized, however, that some trial courts have determined that with a thorough and careful voir dire and appropriate cautionary instructions, an impartial jury may be selected. Accordingly, he found that "it would be appropriate that any motion for authorization to reproduce the videotapes should be submitted to the trial court." Order at 8–9.

On March 14, 1985, a federal grand jury sitting in Miami indicted all four Defendants in this action.[3] The nineteen count indictment charges the Defendants with violations of the Travel Act, conspiracy and various narcotics offenses. Through a random selection process, the case was assigned to the undersigned Judge for trial.

This Court held a hearing on the media's application on March 15, 1985. The Court heard oral argument from all parties and permitted the parties to submit additional memoranda of law.

## THE PUBLIC'S RIGHT OF ACCESS

■ The issues raised by the media's application are not new. The Supreme Court has emphasized that "[w]hat transpires in the courtroom is public property," *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947) and that the public has strong interest in a full opportunity to know whatever happens in a courtroom. *See Press-Enterprise v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 13 L.Ed.2d 248 (1982); *Richmond Newspapers Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).

■ Thus, the courts in this district as well as other federal courts have repeatedly recognized that once a tape has been admitted into evidence and played in open court, the common law and the first amendment establish the right of those interested to inspect and copy the tape. *See, e.g., United States v. Miller*, 579 F.Supp. 862 (S.D.Fla.1984) (Aronovitz, J.); *United States v. Lacayo*, 572 F.Supp. 1222 (S.D. Fla.1983) (King, J.); *United States v. Hastings*, 9 Med.L.Rptr. 1488 (S.D.Fla. Case No. 81–596–Cr–ETG, Jan. 10, 1983) (Gignoux, J.); *United States v. Maddox*, 7 Med.L.Rptr. 2600 (S.D.Fla. Case No. 81–330–Cr–CA, Jan. 12, 1982) (Atkins, J.); *In re: Application of National Broadcasting Co. (Myers)*, 635 F.2d 945, 952 (2d Cir.1980); *In re: Application of NBC (Criden)*, 648 F.2d 814 (3d Cir.1981); *United States v. Martin*, 746 F.2d 964 (3d Cir.1984); *In re: Application of NBC (Jenrette)*, 653 F.2d 609 (D.C.Cir.1981); *United States v. Mouzin*, 559 F.Supp. 463 (C.D.Cal.1983); *In re: Application of WFMJ*, 566 F.Supp. 1036 (N.D.Ohio 1983); *United States v. Pageau*, 535 F.Supp. 1031 (N.D.N.Y.1982); *United States v. Carpentier*, 526 F.Supp. 292 (E.D.N.Y.1981); *United States v. Shannon*, 540 F.Supp. 769 (N.D.Ill.1982).

The right to inspect and copy obtains even when the press and the public already

---

**3.** The return of an indictment in this matter effectively mooted the reason the Magistrate gave for denying access to the press. The Magistrate did not make any provisions for release of the tapes if and when an indictment was returned against the Defendants. Rather, he suggested that any request for release of the tapes after indictment should be addressed to the trial judge.

**48**

have the information pertaining to the evidence. For example, the second circuit in *Myers* observed that even though the public already had the transcripts of the AB-SCAM videotapes, there remained "a legitimate and important interest in affording members of the public their own opportunity to see and hear evidence that records the activities of a Member of Congress and local elected officials, as well as agents of the Federal Bureau of Investigation." 635 F.2d at 952. Similarly, in *WFMJ Broadcasting Co.* the court found that the media should be permitted to copy tapes admitted into evidence because "transcripts are not a substitute for tapes which are the actual evidence." 566 F.Supp. at 1042. In the present case, the press and the public were permitted to watch and sketch the tape as it was played, and report on its contents. However, denying the media permission to broadcast the tape itself effectively denies the public of what even the Magistrate acknowledged was the most accurate account of the conduct which led to the Defendants' arrest.

■ Although the public's right to access is not absolute, "[w]here ... [there are] attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper,* 457 U.S. at 606–07, 102 S.Ct. at 2619–20. And the showing required to limit access to matters which have already been placed in the public domain is particularly strong. As the second circuit observed in one of the "Abscam" cases:

> ... there is a presumption in favor of public inspection and copying of any item introduced into evidence at a public session of a trial. Once the evidence has become known to the members of the public including representatives of the press, through attendance at a public session of court, it would take the most extraordinary circumstances to justify restrictions on the opportunity of those not physically in attendance in the court-

room to see and hear the evidence when it is in a form which readily permits sight and sound reproduction.

*Myers,* 635 F.2d at 952 (footnotes omitted).

Thus, a Defendant seeking to prevent access to tapes introduced into evidence in open court has a particularly heavy burden.

### THE DEFENDANTS HAVE NOT MET THEIR BURDEN

The Defendants contend that providing the media access to the tape will potentially jeopardize their rights to a fair trial. But this court finds that "[t]he alleged risk to a fair trial ... is too speculative to justify denial of the public's right to inspect and copy evidence presented in open court." *Id.* at 953.

■ There has been no showing that release of the tape itself would result in irreparable damage to the Defendants' fair trial rights. Indeed, the Supreme Court in *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975) explicitly rejected the proposition that

> juror exposure to information about a ... defendant's prior convictions or *to news accounts of the crime with which he is charged* alone presumptively deprives the defendant of due process. (Emphasis added)

*See also Myers,* 635 F.2d at 953 ("despite the extensive publicity about Abscam ... about half of those summoned for jury selection had no knowledge of Abscam, and only a handful had more than cursory knowledge"); *United States v. Haldeman,* 559 F.2d 31, 62 n. 37 (D.C.Cir.1976), *cert. denied sub nom., Ehrlichman v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) ("Most of the venire simply did not pay an inordinate amount of attention to Watergate"); *Associated Press v. U.S. District Court,* 705 F.2d 1143, 1146 (pretrial documents in widely publicized prosecution of John DeLorean could be

made available to public without irreparably injuring fair trial rights).[4]

Defendants also have not demonstrated that alternatives to closure could not adequately protect fair trial rights. Undoubtedly, broadcast of the tape will greatly increase the number of people with knowledge of the tape's content beyond those already aware of the videotaped event through reading press accounts and viewing television newscasts. This Court also does not doubt that actually seeing the tape will create a stronger impression on people than merely hearing a news account of the content of the tape.

But such an enhanced awareness does not mean that the Defendants' right to a fair trial will be at all abridged. This Court has found that searching voir dire examination can identify those persons who have been so affected by their exposure to pretrial publicity that they cannot fairly decide the issues of guilt or innocence. Particularly in a large metropolitan area like Miami, with so many potential jurors, this Court believes it likely that "searching questioning ... to screen out those with fixed opinions about guilt or innocence" and "the use of emphatic and and clear instructions on the sworn duty of each juror to decide the issues only on the evidence presented in open court," will produce a fair jury. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 564, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683 (1976). *See also United States v. Lacayo,* 572 F.Supp. 1222, 1223 (S.D.Fla.1983) (permitting access to tapes where court found that fair trial rights could be safeguarded through cautionary instructions and careful voir dire).

Of course, if the voir dire examination should reveal that an impartial jury cannot be assembled or that the jury assembled does not represent a fair cross section of the community, this Court can take additional protective measures such as continuing the trial until public attention has subsided or changing the venue to a place less exposed to the publicity. *See Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966).

The circumstances of the instant case are virtually identical to those addressed by the Honorable Sidney Aronovitz of this court in *United States v. Miller,* 579 F.Supp. 862 (S.D.Fla.1984). The Defendants in *Miller,* like the Defendants in this case, had been indicted for conspiracy to import cocaine. At a bond hearing for the Defendants, the Government submitted a detailed affidavit describing the contents of certain audio and video tape recordings which purportedly showed one of the Defendants taking cash from a Drug Enforcement Agency special agent in exchange for an agreement to permit an airfield in the Bahamas to be used as a landing site for the importation of illegal drugs. At a subsequent bail reduction hearing, the Government played in open court portions of two of the audio and video tapes described in the affidavit and introduced the remainder of the tapes in evidence.

Before the trial of the case, Post-Newsweek, Sunbeam and NBC filed motions seeking permission to copy both the tape recordings which had been played at the bond hearing and the tape recordings described in the affidavit. The Government did not object to allowing the intervenors to copy the tape recordings actually played in open court. The Defendants did object, arguing that release of the tapes would jeopardize their rights to a fair trial.

Judge Aronovitz balanced the rights of the Defendants in *Miller* and the rights of

---

**4.** The Court notes that the jurors who hear this case will probably view the videotape at issue because it is likely that the Government will show the videotape at the trial. Although the Court does not intend in any way to prejudice the merits of any motions to suppress, an initial examination of the tape does not indicate any obvious indicia of illegality. For example, government agents appear to have been present throughout the tape. Accordingly, it does not appear that the surveillance would be subjected to the stringent requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1970). *Compare In re Globe Newspaper,* 729 F.2d 47 (1st Cir. 1984) (first amendment right of access to pretrial bail hearing is outweighed in part by defendant's privacy rights under the provisions of Title III).

**50**

the media intervenors. He concluded that in the absence of any particularized showing that access would jeopardize the Defendants' fair trial rights and that no alternatives exist which would protect these rights while also permitting inspection and copying of the tapes, the tapes and the transcripts of the tapes which had been admitted in evidence at the bail reduction hearing should be made available to all members of the press and public. This Court agrees.

## CONCLUSION

This Court is well aware that "[n]o right ranks higher than the right of the accused to a fair trial." *Press-Enterprise Co. v. Superior Court of California,* 464 U.S. 501, ——, 104 S.Ct. 811, 819, 823, 78 L.Ed.2d 629 (1984). This Court further recognizes that it has "an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity." *Gannett Co. v. Depasquale,* 443 U.S. 368, 378, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979). In this case, however, the Court is satisfied that denying the press access to the tapes is not necessary to ensure a fair trial. In permitting the tape to be released to the press, this Court also commits itself to conducting a searching voir dire of prospective jurors and taking whatever other steps may be necessary to ensure that the Defendants' rights are fully protected.

In keeping with this Court's previous announcement at oral argument, the effect of this Order is stayed until 12:00 p.m. on March 25, 1985 to allow the Defendants to seek whatever appellate relief may be available.