**In re Application of WFMJ BROAD-CASTING COMPANY, et al.**

**UNITED STATES of America, Plaintiff,**

v.

**James A. TRAFICANT, Jr., Defendant.**

**Crim. A. No. CR82–148Y.**

United States District Court,
N.D. Ohio, E.D.

May 11, 1983.

Stephen T. Bolton, Youngstown, Ohio, for defendant.

Charles S. Lanz, Youngstown, Ohio, for applicant WFMJ Broadcasting Co.; Manchester, Bennett, Powers & Ullman Co., L.P.A., Youngstown, Ohio, of counsel.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Pending before the Court are several petitions of various television stations for an order permitting them to receive and make copies of tape recordings which the government intends to introduce into evidence during the course of the instant criminal trial. The first of these applications was filed four days after the trial commenced.

Petitioners are WFMJ Broadcasting Company, WKBN Broadcasting Corporation, and WYTV, Inc., all corporations in the television broadcasting business operating stations located in Youngstown, Ohio; and Scripps-Howard Broadcasting Company, Inc., a.k.a. WEWS-TV 5; the National Broadcasting Company, Inc., and its wholly owned subsidiary, WKYC-TV3, all corporations in the television broadcasting business

operating stations located in Cleveland, Ohio.

The Youngstown broadcasters premise their request on the long-established common law right of access to judicial records and documents, and seek access to the tapes only after they have been received in evidence at the trial.

The Cleveland broadcasters seek immediate access to the tapes and permission to copy them before they have been received in evidence at the trial, with the understanding that they will not actually be aired until after they have been heard by the jury. The Cleveland broadcasters argue that the constitutional right to attend criminal trials should be expanded to include a constitutional right of access to exhibits and evidence to be used at trial.

The defendant in the criminal trial, James A. Traficant, Jr., opposes the broadcasters' petitions and urges that this Court not allow the copying of the tapes for broadcast at any time.

The government takes an officially mandated position of neutrality.

Upon consideration of the written pleadings, and after a lengthy hearing, this Court grants the broadcasters' petitions, subject to the limitations delineated below.

## FACTS

This controversy arises as a result of the current criminal trial of the present Sheriff of Mahoning County, James A. Traficant, Jr., on charges of accepting $163,000 in bribes from reputed organized crime figures during his election campaign. Traficant is charged with violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 and Ohio's bribery statute, O.R.C. § 2921.02(A) and (B). He is further charged with failing to report the alleged bribes on his federal income tax return, in violation of 26 U.S.C. § 7206(1).

Traficant was indicted on August 9, 1982. On August 12, 1982, in a somewhat unorthodox move, the government filed a Notice of Intention to Use Evidence, to which was attached a 200-page transcript of tape recordings to be used at trial, and a collection of FBI 302 forms. These revealed that, nearly one year before Traficant's indictment, the FBI obtained tape recordings of apparent conversations between Traficant and reputed organized crime figures in the Mahoning County and Trumbull County areas. On these tapes, made not by the FBI, but apparently by the organized crime figures without the knowledge of Traficant, the voices of Traficant, Charles and Orland Carrabia, and others, are heard discussing exchanges of money between themselves and between Traficant and James Prato and Joseph Naples. The Carrabias, Prato, Naples and Samuel Traficant are named as unindicted coconspirators in the indictment.

The FBI first became aware of these tape recordings when agents conducted a consent search at a Pennsylvania home and discovered a tape recording in a breadbox. The "breadbox tape" recorded conversations between Traficant and Charles and Orland Carrabia and others. Subsequently, the FBI learned through informers that the "breadbox tape" was just one of many copies of tape recorded conversations apparently made by Charles Carrabia.

Testimony of FBI agents at a suppression hearing and at the trial was that, after the FBI acquired the "breadbox tape" recording in April of 1981, agents of the FBI confronted Traficant about his involvement with the persons recorded as well as those discussed on the tapes. During the FBI's first meeting with Traficant, on June 15, 1981, a portion of the "breadbox tape" was played, and Traficant signed a statement admitting that he had received money from the Carrabias, Naples, and Prato in exchange for permitting illegal activities. Although all the agents who witnessed the signing testified that Traficant emphatically declared that the statement "isn't true", he did sign it. In subsequent meetings, the FBI and Traficant discussed plans for Traficant to assist the FBI in an investigation intended to expose the root of political corruption in the Mahoning Valley.

Testimony of the FBI agents further disclosed that when the FBI and Traficant no

longer could agree on these plans, the meetings terminated. On September 1, 1981, the FBI acquired an additional set of copies of the recorded conversations when FBI agents executed a search warrant for the contents of a safe deposit box in a bank in Poland, Ohio. The safe deposit box was leased to Jean Celec, sister of Charles and Orland Carrabia. The three tapes recovered from the safe deposit box were substantially similar to the breadbox tapes except for the fact that the safe deposit tapes contained some five to ten minutes of additional conversation. These are the tapes to be used at trial, presumably because they are more complete. On August 9, 1982, Traficant was indicted. The safe deposit tapes are the tapes to which the broadcasters seek access.

It is clear that a great deal of the government's case is centered on the tape recordings and Traficant's signed statement. This Court conducted a lengthy suppression hearing to determine the admissibility of both the tapes and the statement prior to trial. The admissibility of the tapes was, in some respects, a question of first impression for a number of reasons. The tapes were not originals, but copies of an original recording which apparently was not available to either party. There were a number of gaps in the tapes and the person who made the recordings could not be produced to testify as to how the gaps occurred or even how the tapes were made. This Court found that the tapes were properly admissible at trial as evidence to be presented to the jury with appropriate jury instructions regarding the jury's responsibility to make its own evaluation of the tapes' weight and credibility.

The transcripts filed by the government on August 12, 1982 contained the government's verbatim transcription of Traficant's alleged conversations with the Carrabias. As public records filed with the Court, these transcripts were available for inspection and copying by the public and by the media. To date, approximately thirty copies of the transcripts have been sold to the media and to the public. Extensive media attention has been focused on the trial and its protag-

onists during the eight months preceding the trial.

The government and Traficant must share the responsibility for the pervasiveness of this publicity. The first round of news reports was sparked by the government's filing of its Notice of Intention to Use its unusual evidence. Traficant's repeated appearances on television and radio talk shows, both national and local, and his frequent calling of press conferences has been, no doubt, an attempt to counteract the earlier news coverage based on the government's evidence. However, Traficant has in no respect assumed a low profile and the continuing high level of media interest in his case can be attributed, at least in part, to his continuing efforts to call attention to himself. In an early pretrial conference, this Court cautioned Traficant about his continued high profile before the media. *See,* Transcript of Pretrial Conference of September 24, 1982, pp. 27–30. As a consequence of the publicity, when jury selection began on April 25, 1983, only twelve of seventy-eight veniremen stated that they had no prior knowledge of the case.

## CONCLUSIONS OF LAW

### I. *The Constitutional Right of Access*

The Supreme Court has ruled that public access to judicial criminal proceedings rises to the level of a constitutional right. *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982), (citing *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980)). This Court is urged to expand the constitutional public right of access to attend criminal trials enunciated in these cases to create a constitutional right to judicial records contemporaneously with their introduction into evidence. This Court declines to do so, primarily because it is not necessary for the Court to reach the question. The broadcasters' applications can be granted based on the common law right.

The Cleveland broadcasters advocate their constitutional argument to bolster their request for access to the tapes prior to the time when they are played to the jury in open court. Even if this Court were persuaded by the constitutional argument, it would not find that prior access would be appropriate. The broadcasters' right, whether it be common law or constitutional, does not attach until the tapes have been received in evidence and played in open court. It is the tapes' admission into evidence and their presentation to the jury and observing members of the public which gives rise to the broadcasters' right to copy and further broadcast the tapes. *See,* Parts A, C, and D, *infra.* The broadcasters' right to hear these tapes is no greater than that of the general public. Media preferential access to these tapes is a consequence of the media's special capability to disseminate information to a large segment of the population. Hence, while it may be appropriate to provide special concessions to the media in order to facilitate the dissemination of information, media *rights* to tapes and information concerning court proceedings are equal to, but in no way superior to, those of the public. *See, Richmond Newspapers, supra* at 573, 100 S.Ct. at 2825.

The Cleveland broadcasters' arguments in favor of a constitutional right to evidence at trial are well-founded. Just as the Supreme Court's reluctance to embrace a "narrow, literal conception of the [First] Amendment's terms", *Globe Newspapers, supra* at 2619, gave rise to a constitutional right of access to criminal trials, the same view could make a constitutional right to evidence an appropriate adjunct to insure that such proceedings are "open". It is important to note, however, that even the constitutional right of access to criminal trials is not absolute. *Richmond Newspapers, supra* at 581, n. 18, 100 S.Ct. at 2830, n. 18. In appropriate circumstances, a trial may be closed so long as a trial court does not abuse its discretion in ordering closure. *Id.* It is appropriate to employ this approach to requests for access to evidence and tape recordings, for not all evidence should be disbursed indiscriminately into the public domain. *See, In re Application of KSTP Television,* 504 F.Supp. 360 (D.Minn.1980), (District Court denied television stations' applications to copy tape recordings made by defendant recording his repeated rapes of a church missionary worker.) Every court has supervisory power over its own records and files, and has the power to deny access where these items might be used improperly. *Nixon v. Warner Communications,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Where privacy interests, as in *KSTP, supra,* or other considerations are present, a court's discretion to deny access should not be fettered by absolute rights of access.

II. *The Common Law Right of Access*

It is well-settled law that the courts of this country recognize a common law right of access to judicial records and documents. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). This right to inspect has been extended to include the right to make copies of documents introduced into evidence including tape recordings. *In re National Broadcasting Co., Inc.,* 653 F.2d 609, 612 (D.C.Cir.1981) ("NBC"); *United States v. Criden,* 648 F.2d 814, 823 (3d Cir. 1981); *United States v. Myers,* 635 F.2d 945, 950 (2d Cir.1980). The Supreme Court first recognized this right to copy tapes in the Watergate tapes case although the Court ultimately prohibited reproduction of the tapes for public broadcast because of Congressional modification of the common law right with respect to the Watergate tapes. *See, Myers, supra* at 950 citing *Nixon v. Warner Communications, Inc., supra.* This common law right of access is not absolute, but is rather left to the discretion of the court. *Id.* 435 U.S. at 603, 98 S.Ct. at 1315.

The court's exercise of its discretion is not to be open-ended. *Myers, supra* at 613; *U.S. v. Mitchell,* 551 F.2d 1252, 1260 (D.C.Cir.1976) *rev'd on other grounds sub nom. Nixon v. Warner Communications,*

*Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). However, courts have disagreed on the proper standards for the court to employ in exercising its discretion. Compare *U.S. v. Mitchell, supra* at 1260, (access may be denied only if the court, after considering all relevant factors and weighing the interests of the parties and the public concludes that justice requires denial of access) and *Myers, supra* at 952, (only most extraordinary circumstances will justify restrictions on access once evidence has become known to the public and media through their attendance at trial). Although this precise question has not been presented to the Sixth Circuit, other Courts of Appeals which have considered a similar issue agree that there is a strong presumption in favor of access. *United States v. Edwards,* 672 F.2d 1289, 1294, 1296 (7th Cir.1982); *United States v. Criden,* 648 F.2d 814, 823 (3d Cir.1981); *In re Application of National Broadcasting Company, Inc.,* 653 F.2d 609, 614 (D.C.Cir.1981); *United States v. Myers,* 635 F.2d 945, 952 (2d Cir.1980); cf. *Belo Broadcasting Corporation v. Clark,* 654 F.2d 423, 433 (5th Cir.1981). This Court is convinced that the factors in favor of public access to the tapes outweigh the interests of those who oppose release of the recordings.

### A. The Public Interest is Promoted by Openness

■ The Supreme Court has emphasized the high public interest in full opportunity to know whatever happens in the courtroom except in those limited situations justifying nondisclosure of particular evidence. *Myers, supra* at 951. Open trials promote public confidence in the objective administration of justice. The Supreme Court has emphasized the importance of society's criminal process satisfying the appearance of justice. The appearance of justice can best be provided by allowing the public to observe it. *United States v. Criden, supra* at 821, (citing *Offutt v. United States,* 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954)). The tapes will be heard by persons who are able to attend the trial. There can be no reason to discriminate against those persons who cannot personally observe the courtroom proceedings. Releasing the tapes will promote the integrity of the judicial process by opening a portion of the trial to those members of the public who could not attend the trial, thereby enabling them to evaluate, to some extent, the facts of the case. *NBC, supra* at 614.

Courts have repeatedly agreed that a trial is a public proceeding and what transpires in the courtroom, in the cognizance of the public, is public property. *Craig v. Harney,* 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947). However, this right is not unlimited and is a matter of trial court discretion. Hence, *Craig's* broad statement does not apply to the right to copy exhibits. *Criden, supra* at 830 (Weis, J., concurring and dissenting).

### B. Public Scrutiny Of Public Officials Is Encouraged

■ There is a legitimate and important interest in allowing the public full opportunity to hear evidence that records the activities of a locally elected official. *Myers, supra* at 952; *NBC, supra* at 613. The presumption in favor of access is especially strong in a case where the evidence reveals the actions of public officials. *See, Myers, supra* at 952. This interest is doubly present in the instant case where the chief law enforcement officer of Mahoning County is on trial for acts of corruption which allegedly took place during a public election campaign. Judicial notice is taken of the strong public interest in maintaining honest and open election campaigns. This important public policy is evidenced by state and federal election laws which specifically regulate, among other things, campaign contributions. The acts charged in the indictment allegedly occurred at a time when the Sheriff and his associates were subject to Ohio election laws. The alleged offenses took place at a time when the Sheriff was attempting to demonstrate his right to hold an office traditionally sworn to protect and serve the public safety. Hence, a number of factors not only militate in favor of public disclosure, they require it. This

Court rejects Traficant's contention that he is "just like anyone else" in Mahoning County. The responsibilities of public office carry expectations beyond those demanded of citizens not elected to public office.

Moreover, every opportunity for public scrutiny should be encouraged when law enforcement agencies have been accused of misconduct. *NBC, supra* at 614. In the instant case, accusations that the FBI has abused its power should be open for public debate. Public debate cannot be meaningful and constructive if it is not informed.

### C. Previous Access Supports Release Of Admissible Evidence

The instant applications do not request evidence of questionable admissibility. This Court has previously determined that the tapes are admissible at trial. The *Myers* court recognized that a different question would arise if the requested evidence had not been ruled admissible. *Myers, supra* at 952. There is an important difference between exhibits which have merely been marked for identification and those which have been received into evidence. Only items received into evidence are presented to the jury and can be considered by it when deliberating. The admissibility of the evidence weighs in favor of its release to the public. The rules of evidence impose strict requirements governing admissibility. The tape recordings at issue have already met this test and have been deemed sufficiently sanitized for presentation to the jury. The public need not be shielded from information which has been deemed to be reliable enough to be presented to the jury. Moreover, case law recognizes that previous access to tapes by members of the public in attendance at trial is a factor which supports subsequent access to the general public. *NBC, supra* at 614.

### D. Transcripts Are Not A Substitute For The Tapes

■ As noted previously, transcripts of the tape recordings have been widely disseminated for months prior to trial. Argu-

ably, these transcripts have provided opportunity for the public to become acquainted with the tapes' contents. However, the transcripts are not a substitute for the tapes which are the actual evidence. Moreover, the transcripts, which were prepared to reflect the government's version of the recorded conversations, have been corrected through mutual agreement of the defendant and government. These corrected transcripts have been prepared solely as trial aids for the jury, as they listen to the tapes. The transcripts are not evidence and will not be received as such. They will not be circulated to the media, nor will the jury be permitted to use the transcripts during its deliberations. The public is entitled to access to evidence introduced at trial in the form in which that evidence has already been seen and heard by persons attending the trial. This is true where the evidence is susceptible of copying without risk of injury to its integrity. *Myers, supra* at 952.

### III. Arguments In Opposition To Release Are Not Adequate To Overcome The Presumption Of Public Access

Traficant claims that broadcast of the tapes will increase the likelihood of tainting the jury. The jury has been admonished repeatedly to avoid media reports of the trial proceedings and this Court cannot find that release of the tapes will increase the likelihood that the jury will disregard its instructions. Since the jury has already been selected, release of the tapes will not affect jury selection. Furthermore, the jury will hear the tapes played during the trial. The broadcasters will not have access to any recordings which the jury has not previously heard. Moreover, the potential risk of causing prejudice at a hypothetical second trial will not support non-release of the tapes. *NBC, supra* at 615. As previously noted, only twelve of the seventy-eight veniremen had not heard of the case. Despite this high level of awareness, this Court was able to select a jury, and it did so in a manner compatible with the Sixth Circuit's directives in *United States v. Blanton,* 700 F.2d 298 (6th Cir.1983). Veniremen

were questioned about the sources of pretrial publicity to which they were exposed, the intensity of the exposure, and their ability to disregard that publicity. *Blanton, supra,* Slip Op. at 19. Moreover, this Court is in accord with the finding in *NBC, supra* that the extent of public awareness of news is sometimes overestimated. *Id.* at 616. Likewise overstated is the public's susceptibility to being unduly influenced by the media. Should the possibility of a retrial become a reality, this Court is confident that enough persons can be found who have either not heard the tapes, or who have heard the tapes but would be capable of setting aside any impression or opinion and instead render a verdict based only on the evidence presented at trial.

Traficant's concerns over the manner in which the tapes may be edited cannot prevent release. See *NBC, supra* at 616. Confidence in the responsibility of the media must prevail until reason is given to find otherwise. Admittedly, the media has been known to behave irresponsibly at times; however barring them access for that reason is not only personally repugnant to this Court, but is also inimicably hostile to our way of life. Factored into this decision is the fact that Traficant does not claim that the events recorded on the tapes did not occur or were inaccurately recorded. His primary concern is that all viewers be aware of his intent and state of mind at the times of the recordings. The broadcasters have suggested that members of the public should have their own opportunity to evaluate these elements themselves by listening to the inflection in the voices of those recorded, as well as their tone of voice, their delivery and the timing of their remarks. In these areas, the Court agrees, the actual recordings are certainly more accurate than a transcript.

Traficant also expresses concerns over the "shock value" that the actual tapes will have on a listening audience.[1] Again, this Court notes that Traficant does not claim that the statements on the tapes were not made. Traficant cannot hope to prevent release by arguing that he's only trying to protect the public. In light of Traficant's recent penchant for presenting his case before the public and media, not infrequently peppering his presentations in public press conferences with profane language, Traficant's sudden aversion to further broadcast publicity is inexplicably inconsistent. *See, The Plain Dealer* article of April 19, 1983, "FBI Nearly Sacrificed A Life To Aid Probe, Traficant Says", Appendix A.

Traficant also claims that interests of protecting third persons on the tapes should prevent their release for broadcast. With respect to third persons whose voices are recorded, this Court notes the applicability of the well established rule that no person has a right to prevent the disclosure of a conversation by another party to the conversation, whether the disclosure be simply by repeating the conversation or by recording it. *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). As for third persons whose names are mentioned on the tapes, the transcripts have already disclosed their identities. In the nine months since the transcripts were made public, this Court has not been made aware of any objections by any of these persons.

Traficant, as the party opposing release of the tapes for broadcast, has the burden of showing that justice requires denial of the applications. *Criden, supra* at 817. Traficant has not met his burden. The presumption in favor of access prevails.[2]

---

1. Mindful of FCC regulations concerning the broadcast of certain material, this Court notes that the number of George Carlinisms on the recordings may result in more bleeps than words in some passages. *See, FCC v. Pacifica Foundation,* 438 U.S. 726, 751–756, 98 S.Ct. 3026, 3041–44, 57 L.Ed.2d 1073 (1978).

2. This decision to release the tape recordings is explicitly restricted to only the tapes. The right of access does not apply to sidebar conferences, which have clearly been held to fall within a category distinct from testimony and evidence presented before the jury and public in open court. *See Richmond Newspapers, supra* 448 U.S. at 598, n. 23, 100 S.Ct. at 2839, n.

**1044**

## IV.  *Local Rule 11*

■  The judges of this district have adopted Rule 11 of the Rules of the United States District Court, Northern District of Ohio to regulate the use of photography, radio and television in this district.  Rule 11.01 states in part

> ... the use of equipment incident to radio or television broadcasting from the courtroom or its environs, during the progress of and in connection with judicial proceedings, both civil and criminal, whether or not court is actually in session, ... is prohibited.

This rule has been interpreted by the judges of this district to prohibit so much as even the presence of recording equipment in the courthouse.  Hence, such devices are banned from the building.  This Court finds this interpretation overly restrictive, particularly with respect to the issue before the bar.  This Court agrees with the broadcasters' distinction between the broadcast of legal proceedings versus the copying of an exhibit introduced as evidence at trial.  The *Edwards* and *Criden* courts' analysis and rejection of the lower courts' reliance on the Judicial Conference resolution prohibiting the broadcasting of trials is applicable to Local Rule 11's restrictions.

> ... The Judicial Conference resolution is based on apprehension about the effect that contemporaneous broadcast of trial

23.  "The right of access does not apply to all aspects of criminal trials under all circumstances."  *Globe Newspaper Company v. Superior Court,* — U.S. —, 102 S.Ct. 2613, 2624, 73

proceedings might have on the conduct of the trial itself.  This cannot be a relevant factor when the material sought for copying is merely a tape recording of a pre-existing event, since the participants on the tape cannot posture or otherwise change their behavior to play before a television audience.

*United States v. Edwards,* 672 F.2d 1289, 1295 (7th Cir.1982) (quoting *Criden, supra* at 828–829).  Therefore, this Court does not find that Local Rule 11 prevents the copying of the tapes by television stations for broadcast.

This Court will however, respect the interpretation of its colleagues and deny the broadcasters' request to copy the tapes simultaneous to their playing for the jury.  Rather, the Court will make available each full tape after it has been played in full for the jury.  Arrangements will be made in a manner to avoid disruption of court proceedings and the broadcasters are to arrange a pool for the cooperative sharing of the copies.

Subject to the above limitations, the broadcasters' applications for release of the tapes for copying and broadcast are granted.

**IT IS SO ORDERED.**

L.Ed.2d 248 (1983) (Burger, J., dissenting).  The Court's right to deny release of in chambers status calls, pretrial and trial conferences remains unaltered.

APPENDIX A

THE PLAIN DEALER, TUESDAY, APRIL 19, 1983

# FBI nearly sacrificed a life to aid probe, Traficant says

**By Richard Ellers**
STAFF WRITER

YOUNGSTOWN — In a loud, sometimes profane voice, Mahoning County Sheriff James Traficant yesterday accused Cleveland and Youngstown FBI agents of nearly sacrificing the life of a local man to help their investigation of organized crime in northeastern Ohio.

Traficant, at a news conference, explained why he tried to charge the FBI here and in Cleveland with dereliction of duty, grand theft and interfering with civil rights. U.S. District Judge Frank Battisti on Friday barred Traficant from arresting any agents.

Later yesterday, Mahoning County Prosecutor Vincent E. Gilmartin called Traficant's accusations retaliation against the FBI. Traficant, 41, faces a federal trial Monday on charges of accepting bribes from organized crime figures.

John Dunn, an FBI spokesman in Cleveland, would not comment on Traficant's latest accusations.

Traficant gave reporters excerpts of FBI transcripts of tape-recorded conversations among three organized crime figures of northeastern Ohio.

The transcripts reveal the trio planning the armed robbery and possible killing of Youngstown greenhouse operator Paul Plater, 67.

Plater was attacked by three men June 4. He was bound with tape and shot at with a gun that administers a 25,000-volt electric shock. The shot missed him.

The FBI followed the three men to the greenhouse and burst in after shots were fired from another gun, which belonged to Plater.

Traficant alleged that FBI agents hoped Plater's slaying would go undisturbed so the FBI could stop the three from killing another man, Victor N. Calautti, whose home the FBI had staked out.

The three men, John Holowatuk, Robert Poghen, and Sam Scaffidi, have drawn long prison terms in Mahoning County court for the robbery, and in federal court for gun violations.

The sheriff also said Plater told him he believed FBI agents took thousands of dollars worth of guns, jewelry and other items from his home. According to Plater's signed statement, given to reporters yesterday, Plater said the FBI denied taking the items.

Mahoning County Sheriff James Traficant re-creates the scene of a bungled mob-style slaying, which he accuses the FBI of being slow to prevent.