[No. 51079–2. En Banc. January 23, 1986.]

THE SEATTLE TIMES COMPANY, *Petitioner,* v. FRANK J. EBERHARTER, *Judge of the Superior Court for King County, Respondent.*

*Davis, Wright, Todd, Riese & Jones,* by *P. Cameron DeVore, Daniel M. Waggoner,* and *Margaret L. Schaaf,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Robert S. Lasnik, Senior Deputy,* for respondent.

DURHAM, J.—Through a petition for a writ of mandamus, the Seattle Times Company asks this court to direct Honorable Frank Eberharter to open for public inspection a search warrant affidavit which he ordered sealed. The Times' petition requires us to determine if either the first amendment to the United States Constitution or article 1, section 10 of the Washington State Constitution mandates that the public be given access to a search warrant affidavit in an unfiled criminal case.

The affidavit at issue was submitted by a King County prosecutor to King County Superior Court Judge Frank Eberharter on March 29, 1984, and pertained to an ongoing criminal investigation into the deaths of over 25 young women by, presumedly, a serial killer known as the "Green

River murderer". Based on the affidavit, Judge Eberharter signed a warrant authorizing the police to search a car previously owned by a suspect. The search was executed that same day and certain items were seized.

In his presentation of the affidavit, the deputy prosecutor also submitted a written motion to Judge Eberharter requesting him to order the sealing of the affidavit, the search warrant and, upon completion of the search, the inventory list of items seized. The prosecutor's motion was presented in an in camera proceeding of which no record was kept. Judge Eberharter granted the motion and also ordered that the motion and the order granting the motion be sealed.

The prosecutor inadvertently violated the court's order by providing the Seattle Times with a copy of the warrant and the inventory list. The Times then submitted a motion to Judge Eberharter for access to the search warrant affidavit. Although Judge Eberharter denied the motion, he allowed release of an edited version of the affidavit.

In denying the motion, Judge Eberharter noted that because the victims of the "Green River killer" have purportedly been prostitutes, the police have been actively seeking the cooperation of individuals associated with prostitution. To overcome the reluctance of this group to cooperate with law enforcement officials, the police have promised to maintain the confidentiality of their informants. The trial judge reasoned that release of the unedited version of the affidavit would jeopardize the inroads made by the police into the confidences of this critical information source. In addition, Judge Eberharter found that the release of the informants' names would place the informants in danger from either the Green River killer or others in the prostitution community who would resent the informants' cooperation with the police. Thus, Judge Eberharter concluded that unsealing the affidavit would substantially threaten "the interests of effective law enforcement and . . . the safety of individual informants named in the affidavit at issue." He further stated that he

would reconsider the motion when the investigation resulted in the filing of criminal charges.

In so ruling, Judge Eberharter rejected the Seattle Times' argument that the first amendment to the United States Constitution and article 1, section 10 of the Washington State Constitution require that the public be given access to the sealed document. Because the affidavit did not pertain to a filed criminal case, Judge Eberharter reasoned that neither of the constitutional provisions cited by the Seattle Times applied to this document. Thus, Judge Eberharter applied the common law standard articulated by this court in *Cowles Pub'g Co. v. Murphy,* 96 Wn.2d 584, 637 P.2d 966 (1981) for sealing search warrant affidavits.

We agree that the common law standard, not the constitutional provisions cited by the Times, governs the process by which a search warrant affidavit in an unfiled criminal case can be sealed. We therefore decline to issue a writ of mandamus.

I

In *Cowles,* we established a common law standard under which an issuing judge can seal a search warrant and the records pertaining thereto. We held that, presumptively, these documents must be filed as public documents. *Cowles,* at 590. The presumption of openness can be overcome, however, if the subject of the search, law enforcement officials, or informants upon whose information the search warrant affidavit is based, can persuade the issuing judge that "a substantial threat exists to the interests of effective law enforcement, or individual privacy and safety." *Cowles,* at 590. If such a threat exists, the issuing judge must then determine "whether these interests might be served by deletion of the harmful material." *Cowles,* at 590. If the issuing judge considers the relevant factors and the potential alternatives, his decision will not be overturned absent an abuse of discretion. *Cowles,* at 590.

This carefully crafted analytical framework, however, becomes meaningless unless the decision to seal a

document can be publicly and judicially scrutinized. To ensure effectuation of the common law requirements, we read *Cowles* to implicitly require the issuing judge to file a transcript of the in camera proceeding, the sealing order, and written findings of fact and conclusions of law immediately after the decision to seal is made. Here, the issuing judge initially failed to make the order and underlying rationale available for public inspection. Nonetheless, in a subsequent recorded proceeding instituted by the Seattle Times, the issuing judge balanced the relevant factors, entered written findings of fact and conclusions of law, and released an edited version of the affidavit. Thus, although Judge Eberharter failed to release his determination in a timely fashion, the record developed at the later proceeding clearly demonstrates that he properly determined that disclosure of the affidavit poses a substantial threat to the interests of law enforcement and to the safety of the informants. After an independent review of the document, we concur with this determination.

Because in *Cowles* access to the sealed documents at issue was required under the common law standard, we did not reach the constitutional issues raised. *Cowles,* at 587. Here, however, the denial of public access was justified under the common law standard. Thus, we must decide if the federal or state constitution requires a right of access broader than the access required by the common law standard.

## II

The language of the first amendment to the United States Constitution[1] does not expressly provide for a public right of access to information. Nonetheless, the United States Supreme Court has recognized that "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes,* 408 U.S. 665,

---

[1]The First Amendment provides in pertinent part: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble . . ."

681, 33 L. Ed. 2d 626, 92 S. Ct. 2646 (1971). However, the constitutional protection is not limitless: "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk,* 381 U.S. 1, 17, 14 L. Ed. 2d 179, 85 S. Ct. 1271 (1964). No court has yet determined if the First Amendment protection for seeking out the news requires that the type of document at issue here be made available to the public. Thus, the logical starting point in establishing the parameters of the First Amendment right is to analyze the rationale that the United States Supreme Court has used in finding a right of access.

The Supreme Court has held that the First Amendment requires trials to be open to the public, absent a compelling government interest justifying closure. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 581, 65 L. Ed. 2d 973, 100 S. Ct. 2814 (1979). Although this holding was supported by a majority of the court in *Richmond Newspapers,* the Justices could not agree on a controlling rationale. Justices Brennan and Burger each wrote opinions which emphasized different constitutional foundations from which the First Amendment right springs. *See generally* Fenner & Koley, *Access to Judicial Proceedings: To Richmond Newspapers and Beyond,* 16 Harv. C.R.–C.L. L. Rev. 415 (1981). Under either analysis, the First Amendment does not require that the document at issue here be disclosed.

Justice Brennan's analysis emphasized that "the First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self–government." *Richmond,* at 587 (Brennan, J., concurring). For self–government to flourish, "debate must not only be unfettered; it must also be informed." *Richmond,* at 587 n.3 (Brennan, J., concurring) (quoting *Saxbe v. Washington Post Co.,* 417 U.S. 843, 41 L. Ed. 2d 514, 94 S. Ct. 2811 (1974) (Powell, J., dissenting)). Thus, in Justice Brennan's view, the structural role of the First Amendment would be emasculated without

some protection for news gathering so that the informed debate vital to self–government can occur. *Richmond,* at 588 (Brennan, J., concurring).

Cursorily viewed, this analysis would require public access to the probable cause affidavit at issue here. However, Justice Brennan realized that "'the stretch of [the structural model's] protection is theoretically endless". *Richmond,* at 588 (Brennan, J., concurring) (quoting Address by Associate Justice William J. Brennan, Jr., 32 Rutgers L. Rev. 173 (1979)). He thus limited the scope of the structural analysis by balancing the information sought with the opposing interests invaded. *Richmond,* at 588 (Brennan, J., concurring). In balancing these interests and concluding that public access to criminal trials is entitled to First Amendment protection, Justice Brennan focused on two factors. First, he looked to the deeply rooted historical tradition of public access to trials. *Richmond,* at 589–93 (Brennan, J., concurring). Second, he found that public access to trials substantially furthers the purposes of the trial process itself. *Richmond,* at 593–97 (Brennan, J., concurring). Neither of these factors compels disclosure when applied to an affidavit in support of a search warrant in an unfiled criminal case.

The historical tradition of open trials dates back to the origins of the English common law. *Richmond,* at 590 (Brennan, J., concurring); *Gannett Co. v. DePasquale,* 443 U.S. 368, 420, 61 L. Ed. 2d 608, 99 S. Ct. 2898 (1979) (Blackmun, J., concurring in part, dissenting in part). Although the Seattle Times maintains that a tradition of openness exists regarding search warrants and the documents pertaining thereto, legal historians and this court's own research demonstrate that, unlike trials, these documents have not been uniformly available for public inspection prior to the filing of criminal charges.

In *Cowles Pub'g Co. v. Murphy,* 96 Wn.2d 584, 637 P.2d 966 (1981), this court surveyed the State's counties to determine which of them filed search warrants and the documents pertaining thereto for public inspection. The

court found no generally accepted practice. In fact, many counties allowed the issuing judge to keep these documents in his chambers. *Cowles,* at 589. Thus, as recently as 1981, no uniform tradition of public access to search warrants existed in the state. These shallow historical roots cannot compare with the common law tradition of trials where "there is little record, if any, of secret proceedings, criminal or civil, having occurred at any time in known English history." *Gannett,* at 420 (Blackmun, J., concurring in part, dissenting in part).

A review of the historical literature reveals why the counties of this state had no uniform policy of public access to search warrants. In the 17th century, while the British Parliament and Crown were using the general warrant to sanction serious invasions of personal freedom, the common law began developing the particularity requirements that characterize search warrants today. Reynard, *Freedom From Unreasonable Search and Seizure—A Second Class Constitutional Right?,* 25 Ind. L.J. 259, 266 (1950). In England, these conflicting ideologies were not resolved until the 1760's, when a series of cases limited the executive's power to search and seize. P. Polyviou, *Search and Seizure* 5 (1982). Although limited in England, unreasonable searches and seizures were not restricted in the United States until the passage of the Fourth Amendment. Reynard, 25 Ind. L.J. at 275. Public access to search warrants prior to the initiation of criminal proceedings was simply not addressed in the historical development of the warrant requirements. Unlike trials, the historical record reveals no English or American tradition of public access to search warrants.

Although search warrants do not have a tradition of public access, the Seattle Times argues that the second factor analyzed by Justice Brennan, that public access furthers the purposes of the judicial proceeding itself, is present in the judicial determination of probable cause. The Seattle Times maintains that the values served by requiring public access to trial are also served by opening the probable cause determination to public scrutiny. As this court said in

*Cowles,* at 589:

> Access to search warrants and affidavits of probable cause can reveal how the judicial process is conducted. The procedures employed by the prosecutor and law enforcement can be evaluated. Access may also disclose whether the judge is acting as a neutral magistrate.

Justice Brennan's analysis, however, does not simply focus on the values served by public access. Instead, Justice Brennan's analysis focuses on whether public access is required for the effective functioning of the process itself. Justice Brennan found that public access is necessary to ensure the effective functioning of four core purposes of trial: (1) publicity furthers accurate fact–finding; (2) publicity provides a check on judicial power; (3) publicity ensures the openness of a governmental process that often results in lawmaking; and (4) publicity demonstrates the fairness of the legal process to the citizenry.

██ Unlike trials, the justification for the issuance of a search warrant can be effectively evaluated without public access to the initial determination. Criminal trials and determinations of probable cause play fundamentally different roles in the process of criminal justice. To ensure the protection of individual rights, the judicial determination of probable cause provides a check on an investigating "officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14, 92 L. Ed. 436, 68 S. Ct. 367 (1947). Public scrutiny can provide another check on the process. Nonetheless, when the investigatory phase results in a filed criminal charge, public scrutiny will occur. *Richmond Newspapers, Inc. v. Virginia, supra.* Even if the investigatory search does not result in the filing of criminal charges, the subject of the search who believes that the search was unlawful can file a civil suit. Once the civil suit is filed, the process can be publicly scrutinized. Thus, unlike the ramification of trial closure, public scrutiny is not being denied here; it is simply being postponed. The effectiveness of the check on judicial conduct provided by public access is not seriously diminished by

delaying that access. Furthermore, the delay serves two important interests: (1) it protects the privacy of the person being searched and the informants, and (2) it fosters effective law enforcement. *Cowles,* at 589.

Not only will the public be able to scrutinize the issuing judge's probable cause determination should charges be filed, but this determination may be reviewed by another judicial officer. This review will occur when the prosecution attempts to introduce, at trial, evidence obtained as a result of this probable cause determination. Thus, because of the role of the probable cause determination in the judicial process, immediate public access is not required for the effective functioning of the process itself.

Seattle Times contends that the subsequent check on the issuing judge's determination is often illusory because criminal or civil proceedings do not always result from the issuance of a search warrant. The argument misperceives Brennan's structural model analysis. The objective of the application for, and issuance of, a search warrant is to uncover evidence that will result in the filing of charges. Although this goal does not always reach fruition, the parties to the proceeding are well aware that, if their objective is realized, the process in which they have engaged will be thoroughly scrutinized. Although scrutiny may not occur in every case, the assumption of the parties that charges will be filed regulates the conduct of those involved in the issuance process. Thus, the structural underpinnings of the criminal justice process provide the critical check on the participants of a search warrant issuance proceeding.

The two factors, the deeply rooted historical tradition and the role of public access in furthering the process itself, integral to Justice Brennan's finding that the First Amendment required open trials, are not present in the probable cause determination. An examination of Justice Burger's analysis in *Richmond* is now necessary to validate the conclusion that the First Amendment does not apply to the document at issue here.

Justice Burger's rationale in *Richmond* is based on much

narrower constitutional grounds than Justice Brennan's rationale. Justice Burger primarily relied on the long historical tradition of open trials. *Richmond,* at 563–69. From this tradition Justice Burger reached two conclusions. First, he concluded that at the time the constitution was drafted the courtroom was a public place when a trial was in process. *Richmond,* at 578. Thus, when the right to attend trials is limited, the First Amendment right of assembly is implicated. *Richmond,* at 576. Second, Justice Burger demonstrated that the rights specifically enumerated in the constitution were not intended to be all inclusive. *Richmond,* at 579–80. Thus, he concluded that because "[t]he Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open . . . the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees" contained in the amendment. *Richmond,* at 575.

As demonstrated above, the probable cause affidavits in support of search warrants do not share the long historical tradition of public access. Thus, under Justice Burger's analysis, neither the First Amendment right of assembly nor the penumbras of the Bill of Rights would apply here.

Seattle Times maintains that other courts have since expanded *Richmond* to include proceedings that do not have a tradition of openness.[2] Each of these courts, however, based its holding on the integral relationship between the proceeding in question and the trial. *See United States v. Criden,* 675 F.2d 550, 555 (3d Cir. 1982); *United States v. Brooklier,* 685 F.2d 1162, 1170 (9th Cir. 1982). As the *Brooklier* court said at page 1170:

Since the proceeding on the motion began before trial but concluded during trial, this case illustrates the

---

[2]These cases include: *United States v. Chagra,* 701 F.2d 354 (5th Cir. 1983) (pretrial bail hearing); *United States v. Criden,* 675 F.2d 550 (3d Cir. 1982) (suppression hearing); *United States v. Brooklier,* 685 F.2d 1162 (9th Cir. 1982) (voir dire); *Associated Press v. United States Dist. Court,* 705 F.2d 1143 (9th Cir. 1983) (documents challenged in a pretrial suppression hearing).

impracticability of attaching dispositive significance to the distinction between trial and pretrial proceedings for the purpose of determining the applicability of the first amendment.

An affidavit in support of a search warrant in an unfiled criminal case simply does not have the same integral relation to a trial.

Thus, neither Justice Brennan's analysis, Justice Burger's analysis, nor recently decided cases support the Seattle Times' argument that the First Amendment applies to the document at issue here.

## III

Seattle Times next argues that even if we decide that the federal constitution does not provide for a right of access to the document at issue here, we should allow access under article 1, section 10 of the Washington State Constitution. Article 1, section 10 states: "Justice in all cases shall be administered openly, and without unnecessary delay." The applicability of the provision to a search warrant affidavit has never before been addressed. Thus, the task of this court is to define the contours of the term "justice" as used in article 1, section 10. Unfortunately, the available constitutional history provides no assistance in delineating the scope of the provision. *See Journal of Washington State Constitutional Convention, 1889* (B. Rosenow ed. 1962). Nonetheless, we are not without guidance because this court has previously analyzed the applicability of article 1, section 10 to other proceedings.

Article 1, section 10 provides for a right of access to (1) trials, (2) pretrial hearings, (3) transcripts of pretrial hearings or trials, and (4) exhibits introduced at pretrial hearings or trials. *Seattle Times Co. v. Ishikawa,* 97 Wn.2d 30, 640 P.2d 716 (1982); *see Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 615 P.2d 440 (1980). Unlike the sixth amendment to the United States Constitution in which the right to an open trial is a personal right belonging to the defendant, *Gannett Co. v. DePasquale,* 443 U.S. 368, 61 L.

Ed. 2d 608, 99 S. Ct. 2898 (1979), article 1, section 10 enti-
tles "the *public . . .* to openly administered justice." (Ital-
ics ours.) *Kurtz,* at 59 (quoting *Cohen v. Everett City
Coun.,* 85 Wn.2d 385, 535 P.2d 801 (1975)).

██ Seattle Times maintains that *Kurtz* and *Ishikawa*
support its contention that article 1, section 10 requires all
judicial proceedings to be openly administered. The Times
reasons that the determination of probable cause is a pro-
ceeding involving the judiciary which affects important
individual rights. Public access to the proceeding ensures
that society will be satisfied that justice is being adminis-
tered fairly and that an individual's right to be free from
unreasonable searches and seizures is not trampled. In
developing the common law standard articulated in *Cowles
Pub'g Co. v. Murphy,* 96 Wn.2d 584, 637 P.2d 966 (1981),
we recognized and responded to the legitimate concerns
expressed by the Times. Nonetheless, after reviewing case
law, policy considerations and the language of the constitu-
tional provision, we now conclude that our state constitu-
tion does not provide for a right of access to a search
warrant affidavit until charges relating to the investigation
involving the affidavit are filed.

When harmonized, the cases construing article 1, section
10 distinguish between the investigatory process and the
process of determining guilt or innocence. In *Cohen,* we
held that article 1, section 10 required that a transcript of
an administrative proceeding be made publicly available
when it becomes the basis for a judicial resolution of a civil
controversy. *Cohen,* at 389. We emphasized that article 1,
section 10 was applicable because a "controversy" was being
resolved "on its merits". In *In re Lewis,* 51 Wn.2d 193, 316
P.2d 907 (1957), we held that in the criminal context "jus-
tice" as used in article 1, section 10 meant the process of
determining if an individual is to be punished. *Lewis,* at
198–99. Here a judicial officer is making an ex parte deter-
mination; no controversy is being adjudicated on its merits,
nor is a determination of punishment involved.

The distinction developed in case law between the inves-

tigatory and accusatory stages is supported by the separate interests involved in these two phases of the criminal justice system. Publicity at the trial or pretrial hearing stage of a criminal proceeding safeguards other constitutional rights, including a defendant's fair trial rights. *Gannett,* at 380. In contrast, publicity at the investigatory phase runs counter to the policy embodied in article 1, section 7 of the Washington Constitution and the fourth amendment to the United States Constitution.

> Minimizing the initial intrusiveness of necessary governmental activity is one means of serving fundamental privacy interests, but controlling broadside disclosure of materials or information obtained by intrusive means is another.

*United States v. Hubbard,* 650 F.2d 293, 305 (D.C. Cir. 1980); *see Cowles,* at 584.

Not only is the privacy interest of the subject of a search threatened by disclosure, but the public interest in discovering and capturing the perpetrator of a criminal act is compromised. This interest is statutorily recognized in RCW 10.27.090 which prohibits disclosure of grand jury proceedings. If article 1, section 10 were held to apply to judicial proceedings in the investigatory process, the secrecy required by RCW 10.27.090 could not withstand constitutional scrutiny. Thus, publicity in the investigatory process has repercussions that are not present once charges have been filed.

We conclude that neither the federal nor state constitution provides for a public right of access to a search warrant affidavit in an unfiled criminal case, and we decline to issue a writ of mandamus.

DOLLIVER, C.J., and DORE, PEARSON, CALLOW, and GOODLOE, JJ., concur.

ANDERSEN, J. (concurring in the result)—This case deals with the right of access to public records. The news media is not here seeking favored treatment because the rights of

the media in this regard are coextensive with the rights of the public.[3] Thus, it must be understood that when the rights of the news media are infringed upon in this regard, so, too, are the rights of the public infringed upon.

The whole matter of access to public records once seemed so simple. Almost two decades ago, the concept was clearly and succinctly expressed as follows:

1. Free access to public records is of paramount importance if the public is to be fully informed, and the bench, bar and press have an equal interest in and responsibility to see that this access is maintained.

2. Except where confidentiality is specifically provided for in statutes, all records which must be maintained by law are clearly open to the public.

These words are from the Bench–Bar–Press Statement of Principles and Guidelines of 1966, adopted by the then Bench–Bar–Press Committee of Washington. Not a radical organization, to be sure, this committee's membership consisted of representatives of the following:

Washington State Supreme Court
The Federal Judiciary in Washington
Superior Court Judges' Association
Washington State Magistrates' Association
Washington State Bar Association
Allied Daily Newspapers of Washington
Washington Newspaper Publishers Association
Washington State Association of Broadcasters
The Associated Press
United Press–International
University of Washington School of Communications
Washington State Prosecuting Attorneys' Association
Washington Association of Sheriffs and Chiefs of Police
Washington State Board of Prison Terms and Paroles
Today, unfortunately, court orders sealing public records

---

[3] *See Pell v. Procunier,* 417 U.S. 817, 833–34, 41 L. Ed. 2d 495, 94 S. Ct. 2800 (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 23 L. Ed. 2d 371, 89 S. Ct. 1794 (1969).

appear to be proliferating.[4] So far as press freedoms are concerned, this is a disturbing trend.

It is a basic premise of our democratic form of government that while every well informed, rational adult has the capacity to form his or her own opinion, no one individual has the time or resources to gather all of the information needed in order to form intelligent opinions regarding political, social and economic affairs.[5] Thus, in contemporary society, the news media's most important contribution may well be its news gathering function.[6] That being so, press freedoms connected with the gathering of information should be expanded, not contracted.

The majority's broadening of the holding in *Cowles Pub'g Co. v. Murphy,* 96 Wn.2d 584, 637 P.2d 966 (1981) to now require the judge who orders a record sealed to also file the order, transcript and written findings of fact and conclusions of law immediately after the decision to seal is made, is a significant step in the right direction. Had such a procedure been followed in the present case, the Seattle Times reporters would doubtless not have experienced the runaround in the county superior court clerk's office that apparently occurred. Although the majority predicates its ruling on a common law standard, rather than a constitutional one, the resultant protection of press freedoms is not greatly dissimilar.[7]

I would go further, however, and expand the *Cowles* "presumption of openness of judicial records" principle to specifically declare that this presumption is a very *strong*

---

[4]*See generally* CR 26(a); *Developments Under the Freedom of Information Act—1982,* 1983 Duke L.J. 390; *Developments Under the Freedom of Information Act—1983,* 1984 Duke L.J. 347.

[5]*See Red Lion Broadcasting Co. v. FCC, supra.*

[6]*See Fritz v. Gorton,* 83 Wn.2d 275, 296–97, 517 P.2d 911, *appeal dismissed,* 417 U.S. 902, 41 L. Ed. 2d 208, 94 S. Ct. 2596 (1974).

[7]*Cf. Federated Publications, Inc. v. Kurtz,* 94 Wn.2d 51, 62–63, 615 P.2d 440 (1980); *Seattle Times Co. v. Ishikawa,* 97 Wn.2d 30, 37–39, 640 P.2d 716 (1982).

presumption and thus entitled to *significant weight* in the decisionmaking process.[8] I would hold, as has the Sixth Circuit, that only the most compelling reasons can justify the nondisclosure of judicial records.[9]

As to the case before us, however, it is hard for me to envision a more compelling reason for protecting informants than here where the informants are prostitutes and the person they are trying to assist the police to find is at large, and an alleged serial killer of perhaps two dozen or more young women engaged in prostitution or otherwise involved in the prostitution scene. Thus, under either the common law test, or the "balancing of interests" constitutional test advocated by the Seattle Times, I agree that the Superior Court's order was appropriate insofar as it protected the identities of the two informants.

It is clear from the record before us that the interest of the Seattle Times is not in obtaining and publishing the informants' names, but in taking a stand against what it considers to be the infringement of its rights and the public's rights of access to public records. As has been eloquently expressed:

> An informed public depends on accurate and effective reporting by the news media. No individual can obtain for himself the information needed for the intelligent discharge of his political responsibilities. For most citizens the prospect of personal familiarity with newsworthy events is hopelessly unrealistic. In seeking out the

---

[8]*See In re National Broadcasting Co. (United States v. Myers),* 635 F.2d 945, 952 (2d Cir. 1980); *United States v. Criden,* 648 F.2d 814, 823 (3d Cir. 1981); *In re National Broadcasting Co. (United States v. Jenrette),* 653 F.2d 609, 613 (D.C. Cir. 1981); *Wilson v. American Motors Corp.,* 759 F.2d 1568, 1570–71 (11th Cir. 1985); *In re Knoxville News–Sentinel Co.,* 723 F.2d 470, 476 (6th Cir. 1983); *United States v. Edwards,* 672 F.2d 1289, 1294 (7th Cir. 1982); *United States v. Torres,* 602 F. Supp. 1458, 1464–65 (N.D. Ill.), *cert. denied,* ___ U.S. ___, 85 L. Ed. 2d 150, 105 S. Ct. 1853 (1985); *United States v. Mouzin,* 559 F. Supp. 463, 465–66 (C.D. Cal. 1983); *In re WFMJ Broadcasting Co.,* 566 F. Supp. 1036, 1040–41 (N.D. Ohio 1983); *United States v. Dean,* 527 F. Supp. 413, 415 (S.D. Ga. 1981), *modified on other grounds,* 666 F.2d 174 (5th Cir. 1982).

[9]*In re Knoxville News–Sentinel Co.,* 723 F.2d at 476.

news the press therefore acts as an agent of the public at large. It is the means by which the people receive that free flow of information and ideas essential to intelligent self-government. By enabling the public to assert meaningful control over the political process, the press performs a crucial function in effecting the societal purpose of the First Amendment.[10]

UTTER and BRACHTENBACH, JJ., concur with ANDERSEN, J.

---

[10]*Saxbe v. Washington Post Co.,* 417 U.S. 843, 863, 41 L. Ed. 2d 514, 94 S. Ct. 2811 (1974) (Powell, J., dissenting).